UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                       :
UNITED STATES OF AMERICA                                :     **SEALED**
                                                       :     **INDICTMENT**
            - v. -                                      :
                                                       :     23 Cr. ___
IVAN ARCHIVALDO GUZMAN SALAZAR,                         :
JESUS ALFREDO GUZMAN SALAZAR,                           :
   a/k/a "Alfredo,"                                     :
OSCAR NOE MEDINA GONZALEZ,                              :
   a/k/a "Panu,"                                        :
NESTOR ISIDRO PEREZ SALAS,                              :
   a/k/a "Nini,"                                        :
JORGE HUMBERTO FIGUEROA BENITEZ,                        :     **23 CRIM 180**
   a/k/a "27,"                                          :
LIBORIO NUNEZ AGUIRRE,                                  :
   a/k/a "Karateca,"                                    :
NOEL PEREZ LOPEZ,                                       :
   a/k/a "Tio,"                                         :
SAMUEL LEON ALVARADO,                                   :
LUIS JAVIER BENITEZ ESPINOZA,                           :
   a/k/a "El Fourteen,"                                 :
ALAN GABRIEL NUNEZ HERRERA,                             :
JUAN PABLO LOZANO,                                      :
   a/k/a "Camaron,"                                     :
CARLOS LIMON,                                           :
JESUS TIRADO ANDRADE,                                   :
CARLOS OMAR FELIX GUTIERREZ,                            :
SILVANO FRANCISCO MARIANO,                              :
   a/k/a "Rayo,"                                        :
JULIO MARIN GONZALEZ,                                   :
MARIO ALBERTO JIMENEZ CASTRO,                           :
   a/k/a "Kastor,"                                      :
SERGIO DUARTE FRIAS,                                    :
ANA GABRIELA RUBIO ZEA,                                 :
   a/k/a "Gaby,"                                        :
KUN JIANG,                                              :
YONGHAO WU,                                             :
   a/k/a "Tim,"                                         :
YAQIN WU,                                               :
   a/k/a "Lily,"                                        :
      and                                               :
HUATAO YAO,                                             :
   a/k/a "Yao,"                                         :
                                                       :
            Defendants.                                 :
                                                       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

The Grand Jury charges:

## INTRODUCTION

1.　　Fentanyl is the single deadliest drug threat that the United States has ever encountered. Fifty times more potent than heroin, fentanyl has ruined countless lives, devastated entire communities, and killed Americans at an unprecedented rate.

2.　　From August 2021 to August 2022, 107,735 Americans died of drug overdoses. The majority of those deaths involved synthetic opioids like fentanyl. Between 2019 and 2021, fatal overdoses increased by approximately 94 percent, with an estimated 196 Americans dying every day from fentanyl. In 2022, the United States Drug Enforcement Administration ("DEA") seized over 57 million fentanyl-laced counterfeit prescription pills and over 13,000 pounds of fentanyl powder — the equivalent of about 410 million potentially deadly doses of fentanyl. In total, that is enough fentanyl to kill the entire U.S. population.

3.　　The Sinaloa Cartel (the "Cartel"), based in the Mexican state of Sinaloa, operates in countries around the world and is one of the dominant drug trafficking organizations in the Western Hemisphere. The Cartel is largely responsible for the massive influx of fentanyl into the United States over the past approximately eight years, and for the accompanying violence and deaths that have afflicted communities on both sides of the border.

4.　　The Cartel is led, in part, by IVAN ARCHIVALDO GUZMAN SALAZAR and JESUS ALFREDO GUZMAN SALAZAR, a/k/a "Alfredo," the defendants, and Ovidio Guzman Lopez, a/k/a "Raton," who are sons of the Cartel's notorious former leader, Joaquín Archivaldo Guzmán Loera, a/k/a "El Chapo." Known collectively as the "Chapitos," IVAN ARCHIVALDO GUZMAN SALAZAR, JESUS ALFREDO GUZMAN SALAZAR, and Ovidio Guzman Lopez lead the most powerful faction of the Cartel and the largest, most violent, and most prolific fentanyl trafficking operation in the world.

5.     For years, the Chapitos and their confederates have knowingly reaped hundreds of millions of dollars in profits from the destruction and despair caused by fentanyl, knowing full well that the drug can be lethal to end-users of the Cartel's product. In doing so, the Cartel has driven users of other drugs to fentanyl addiction by mixing fentanyl into other narcotics and selling fentanyl disguised as, for example, legitimate prescription pills. As IVAN ARCHIVALDO GUZMAN SALAZAR, the defendant, has stated to associates, the Cartel seeks to flood the United States with fentanyl in order to supply "streets of junkies." In or about May 2022, during a meeting with other Cartel members, Ovidio Guzman Lopez acknowledged that users of fentanyl can die if the mixture is just a little "off." Indeed, multiple "cooks" used by the Cartel to manufacture its fentanyl at Chapitos-controlled labs in Mexico have died from testing the product.

6.     Since in or about 2014, the Chapitos' fentanyl trafficking operation for the Cartel has grown exponentially in volume, scale, and sophistication. At present, the Chapitos are leading and controlling extensive, multi-faceted, and international operations covering the fentanyl trade — from the procurement of chemical precursors in China, to the shipment of those precursors to Mexico directly or through third countries, to the manufacturing of fentanyl in clandestine labs in Mexico, to the acquisition of military-grade weapons to protect their operations, and ultimately culminating in the distribution of fentanyl across the United States. As described in detail below, chemical manufacturers and brokers in China ship fentanyl precursor chemicals to the Cartel in Mexico; Cartel chemists aligned with the Chapitos use labs hidden in the mountains of Sinaloa and other Chapitos-controlled areas of Mexico to synthesize these chemicals into fentanyl of various potencies and physical forms, including powder and pills; Cartel traffickers then move this fentanyl for the Chapitos across the U.S.-Mexico border on land, by sea, in the air, and

3

underground, for storage in particular stash houses used by the Cartel in the United States; the Cartel's U.S. distribution network then sells fentanyl wholesale to other criminal organizations that redistribute the fentanyl throughout the United States, including in New York City, often passing off the fentanyl pills as counterfeit prescription pain medication and mixing the fentanyl powder into other controlled substances, such as heroin and cocaine, to maximize both the potency of the product and the volume of the sales; and finally, to complete the Cartel's fentanyl distribution cycle, money launderers working with the Cartel surreptitiously repatriate fentanyl proceeds from these U.S. sales with cash, in goods, and through untraceable cryptocurrency, allowing the Chapitos and their conspirators to reap the massive profits from flooding the United States with fentanyl.

7.     To protect and further their fentanyl trafficking operation, the Chapitos and their confederates rely on armed enforcers, known as *sicarios*, as well as corruption and bribe payments, to ensure loyalty to the Cartel and protection. The Chapitos' *sicarios* comprise a security apparatus built to commit acts of violence in order to protect the Chapitos' operation and its leaders, territory, labs, trafficking routes, and money. These *sicarios* regularly use military-grade weapons, including machineguns, to perpetrate violence, including murder, torture, and kidnapping. As described in detail below, Chapitos *sicarios* have shot and killed Mexican government officials, tortured rival drug traffickers, including through electrocution, and even fed some of their victims, dead and alive, to tigers belonging to IVAN ARCHIVALDO GUZMAN SALAZAR and JESUS ALFREDO GUZMAN SALAZAR, a/k/a "Alfredo," the defendants. The Chapitos use their powerful security apparatus to demolish unsupportive businesses, capture contested territory, intimidate civilians, and attack law enforcement. This relentless violence has led to rampant bloodshed and taken the lives of untold people in Mexico and the United States.

The Cartel also relies on corruption and bribe payments to protect the Chapitos' trafficking routes, guard Cartel members, and help enable Cartel members to avoid detection and arrest.

**THE DEFENDANTS**

8.      Ovidio Guzman Lopez, a/k/a "Raton," who is charged in a separate indictment, 23 Cr. 42, returned by a grand jury in the Southern District of New York, is the youngest of the Chapitos brothers and bears primary responsibility for the Chapitos' fentanyl manufacturing and trafficking activities for the Cartel. Ovidio Guzman Lopez controlled the first fentanyl lab used by the Chapitos in or about 2014 and has since overseen the explosion of their fentanyl trafficking activity and profits. Under Ovidio Guzman-Lopez's leadership, Cartel traffickers move fentanyl across the U.S.-Mexico border to locations controlled by the Chapitos in metropolitan areas across the southern United States, from where the Cartel's distribution network transports and sells the fentanyl to customers throughout this country.

9.      IVAN ARCHIVALDO GUZMAN SALAZAR, the defendant, is one of the Chapitos and the oldest son of El Chapo. IVAN ARCHIVALDO GUZMAN SALAZAR leads the Chapitos' security apparatus. In that role, he commands the *sicarios* who perpetrate violence to protect and further the Chapitos' operations and vast holdings. As detailed below, IVAN ARCHIVALDO GUZMAN SALAZAR has ordered and personally perpetrated violence, including the kidnapping and murder of law enforcement officers and rival drug dealers.

10.     JESUS ALFREDO GUZMAN SALAZAR, a/k/a "Alfredo," the defendant, another of the Chapitos, shares responsibility for the security of the Chapitos' operations with IVAN ARCHIVALDO GUZMAN SALAZAR, the defendant, and is a major trafficker of fentanyl and fentanyl precursor. As detailed below, for example, JESUS ALFREDO GUZMAN SALAZAR has shipped fentanyl precursors and finished fentanyl from China through the commercial airport in Mexico City, participated in the torture of rival drug traffickers for the

5

purpose of obtaining information about the infiltration of other organizations into Chapitos-controlled territory, and ordered the shooting of an individual who had robbed him of drugs.

11.     OSCAR NOE MEDINA GONZALEZ, a/k/a "Panu," the defendant, is the principal deputy for IVAN ARCHIVALDO GUZMAN SALAZAR, the defendant, and the day-to-day commander of the Chapitos' security apparatus. MEDINA GONZALEZ oversees each of the Chapitos' regional commanders, who are responsible for security in their designated areas of Mexico, and the Chapitos' gunmen — the *sicarios* — who are dispatched where needed to protect the Chapitos' fentanyl trafficking operations, assassinate rival cartel members, demolish unsupportive businesses, capture contested territory, intimidate civilians, and attack law enforcement, in furtherance of the Cartel's fentanyl trafficking.

12.     NESTOR ISIDRO PEREZ SALAS, a/k/a "Nini," and JORGE HUMBERTO FIGUEROA BENITEZ, a/k/a "27," the defendants, are leaders in the Chapitos' security apparatus. PEREZ SALAS works directly for OSCAR NOE MEDINA GONZALEZ, a/k/a "Panu," the defendant, and holds responsibility within the Chapitos' security apparatus for the security of the Mexican state of Sinaloa. FIGUEROA BENITEZ oversees PEREZ SALAS's personal security and coordinates PEREZ SALAS's fentanyl manufacturing and trafficking activities. PEREZ SALAS and FIGUEROA BENITEZ are both leaders and commanders of the "Ninis," a particularly violent group of security personnel for the Chapitos.

13.     LIBORIO NUNEZ AGUIRRE, a/k/a "Karateca," NOEL PEREZ LOPEZ, a/k/a "Tio," SAMUEL LEON ALVARADO, LUIS JAVIER BENITEZ ESPINOZA, a/k/a "El Fourteen," and ALAN GABRIEL NUNEZ HERRERA, the defendants, are fentanyl traffickers for the Cartel engaged in the movement of vast quantities of fentanyl from Mexico into the United States in pill and powder form.

14.     JUAN PABLO LOZANO, a/k/a "Camaron," the defendant, is a weapons supplier and fentanyl trafficker for the Cartel responsible for distributing fentanyl in the southern United States and for bringing bulk quantities of pistols, automatic rifles, and explosive devices into Mexico from the United States, which are used by the Chapitos and their confederates to perpetrate violence across Mexico.

15.     CARLOS LIMON, JESUS TIRADO ANDRADE, CARLOS OMAR FELIX GUTIERREZ, and SILVANO FRANCISCO MARIANO, a/k/a "Rayo," the defendants, operate clandestine fentanyl laboratories for the Cartel in and around Sinaloa, where fentanyl precursor chemicals imported from China are processed into fully formed fentanyl for subsequent importation into the United States.

16.     JULIO MARIN GONZALEZ, MARIO ALBERTO JIMENEZ CASTRO, a/k/a "Kastor," and SERGIO DUARTE FRIAS, the defendants, are money launderers for the Cartel who, in addition to engaging in fentanyl trafficking, are responsible for facilitating the movement of fentanyl proceeds from the United States to Mexico through, among other methods, bulk cash transport, wire transfers, trade of goods, and cryptocurrency.

17.     ANA GABRIELA RUBIO ZEA, a/k/a "Gaby," the defendant, is a Guatemala-based broker of fentanyl precursor chemicals who buys fentanyl precursor on behalf of the Chapitos, and connects members of the Cartel with suppliers in China who supply the particular chemicals required to manufacture the Cartel's fentanyl at clandestine labs in Mexico controlled by the Chapitos.

18.     KUN JIANG, YONGHAO WU, a/k/a "Tim," YAQIN WU, a/k/a "Lily," and HUATAO YAO, a/k/a "Yao," the defendants, are Chinese suppliers of fentanyl precursor who work for companies in China that manufacture fentanyl precursor chemicals. They source fentanyl

precursor chemicals from their companies' factories in China and ship those chemicals to Mexico, with knowledge that the chemicals will be used in the Cartel's labs to manufacture fentanyl for the Cartel.

## MEANS AND METHODS OF THE
## CARTEL'S FENTANYL TRAFFICKING OPERATION

### Background: The Fentanyl Epidemic

19.     Fentanyl is a dangerous synthetic opioid that is more than 50 times more potent than heroin. Just two milligrams of fentanyl, a tiny amount that could fit on the tip of a pencil, is a potentially deadly dose for a human being.

20.     Fentanyl is now the leading cause of death for Americans ages 18 to 49, and it has fueled the opioid epidemic that has been ravaging families and communities across the United States for the past approximately eight years. It also has fueled violence and destruction across Mexico.

21.     Based on recently reported data, from in or about 2019 to 2021, fatal overdoses surged approximately 94 percent during that period, with an estimated 196 Americans dying each day from fentanyl.

22.     Most of the fentanyl that reaches the United States currently comes from Mexico-based drug traffickers. In recent years, traffickers based in Mexico have increased their production of fentanyl. As of at least in or about 2019, relying on precursors shipped from China and elsewhere, Mexico-based cartels had overtaken China as the manufacturing source of most of the fentanyl trafficked to the United States.

23.     Today, vast loads of fentanyl, including millions of pills and thousands of pounds of fentanyl, are regularly smuggled across the Mexican border into the United States, often in secret compartments in vehicles or in tires, which pass undetected through official ports of entry.

Fentanyl loads are also smuggled through secret tunnels that connect Mexico to the United States, as well as on airplanes and ships, some of which enter the United States legally and others of which do so illegally.

24.     The sheer volume of fentanyl coming across the border is in large part a reflection of how aggressively and successfully the Cartel, as a result of the Chapitos' fentanyl trafficking operation, is flooding the United States with the lethal drug. The amount of fentanyl seized along the U.S. southern border has dramatically increased in the past five years. In 2022, more than 16,200 pounds of fentanyl were seized at the U.S.-Mexico border. Since in or about July 2022, border seizures of fentanyl have averaged approximately 2,200 pounds of fentanyl a month. In November 2022 alone, U.S. authorities seized approximately 2,900 pounds of fentanyl at the border.

### The Sinaloa Cartel

25.     The Sinaloa Cartel is one of the most powerful, longstanding drug cartels in Mexico and is largely responsible for the manufacturing and importing of fentanyl for distribution in the United States. The Cartel is the dominant drug trafficking organization in the Western Hemisphere and the main manufacturer and trafficker of fentanyl to the United States.

26.     The Cartel was formed by, among others, Joaquín Guzmán Loera, a/k/a "El Chapo," in the 1990s. By in or about 2008, El Chapo emerged as the most powerful leader of the Cartel, operating his own faction alongside factions led by Ismael Zambada Garcia, a/k/a "El Mayo," and Juan Jose Esparragoza Moreno, a/k/a "El Azul."

27.     These three factions remained relatively stable until El Chapo was arrested by Mexican authorities in or about 2014. Though El Chapo later escaped Mexican custody in or about 2015, while in custody, the most senior members of the Cartel came together on the ranch of IVAN ARCHIVALDO GUZMAN SALAZAR, the defendant, to discuss the Cartel's future. In

attendance were the leaders of the Cartel's factions, including the heirs apparent to those Cartel members loyal to El Chapo: three of his sons known as the "Chapitos." During this meeting, the Chapitos and the leaders of the other major factions of the Cartel discussed the Cartel's future, and allocated control over the various regions in Mexico — or "plazas" — to those present.[1]

28.     In or about 2016, after having escaped from Mexican custody, El Chapo was arrested again and subsequently extradited to the United States, where he was prosecuted, convicted at trial, and sentenced to life in prison, for his leadership of the Cartel. In or about October 2019, Ovidio Guzman Lopez was temporarily taken into custody in Culiacán, the capital of the Mexican state of Sinaloa, by Mexican authorities for the first time. In response to his arrest, the Chapitos harnessed all military-grade power loyal to them and ordered all available *sicarios* to converge on Culiacán to fight for the release of Ovidio Guzman Lopez. In the ensuing battle, known as the "Culiacanázo," *sicarios* loyal to the Chapitos attacked and killed Mexican government and military officials throughout Sinaloa and surrounded Culiacán, engulfing the city in a wave of violence. Ultimately, the Mexican government released Ovidio Guzman Lopez after significant destruction and approximately 13 deaths, including a member of the Mexican National Guard.

29.     As a result of El Chapo's absence, and certain Cartel factions not coming to the aid of the Chapitos during the Culiacanázo, alliances among the factions within the Cartel broke down and in-fighting among the factions ensued. The Chapitos — IVAN ARCHIVALDO GUZMAN SALAZAR, JESUS ALFREDO GUZMAN SALAZAR, a/k/a "Alfredo," the defendants, and Ovidio Guzman Lopez — and their followers emerged as the largest and most powerful of the Cartel factions, largely due to the relentless campaign of extensive bloodshed by

---

[1] All descriptions of communications herein are set forth in substance and in part.

Cartel *sicarios* loyal to the Chapitos, including one particularly violent group of *sicarios* working for the Chapitos, the "Ninis."

      30.    The Ninis, whose ranks included the outfit's current leaders, NESTOR ISIDRO PEREZ SALAS, a/k/a "Nini," and JORGE HUMBERTO FIGUEROA BENITEZ, a/k/a "27," the defendants, received military-style training in multiple areas of combat, including urban warfare, special weapons and tactics, and sniper proficiency. Under the direction of IVAN ARCHIVALDO GUZMAN SALAZAR and JESUS ALFREDO GUZMAN SALAZAR, a/k/a "Alfredo," the defendants, and under the day-to-day command of OSCAR NOE MEDINA GONZALEZ, a/k/a "Panu," the defendant, the Ninis would kidnap, torture, and kill anyone who opposed the Chapitos.

      31.    At the ranch of IVAN ARCHIVALDO GUZMAN SALAZAR, the defendant, in Navolato, Sinaloa, the Ninis would bring in for interrogation individuals they captured, including rival traffickers, workers loyal to other factions of the Cartel, and officials who refused to facilitate the Chapitos' operations. Once information was obtained from these captives, typically through torture, these individuals were killed — either by or at the direction of the Chapitos themselves — and the bodies disposed of throughout the area. While many of these victims were shot, others were fed dead or alive to tigers belonging to IVAN ARCHIVALDO GUZMAN SALAZAR and JESUS ALFREDO GUZMAN SALAZAR, a/k/a "Alfredo," the defendants, who raised and kept the tigers at their ranches as pets.

      32.    Partly as a result of such violence, the Cartel increased its power and the Chapitos' faction grew. Under the Chapitos' leadership, the Cartel has achieved near total control over all drug trafficking activity in many parts of Mexico, including the manufacturing and importation of fentanyl from those parts of Mexico into the United States.

33.     In Culiacán and many other parts of Sinaloa, the Cartel exerts control through the Chapitos and even requires the payment of "taxes," not only for permission to traffic drugs other than fentanyl, but also on goods like beer, toilet paper, and electronics. Firearms are carried openly in the city by traffickers and *sicarios* loyal to the Chapitos, but prohibited for individuals who are not affiliated with the Chapitos.

34.     As the Cartel's power expanded outside of Sinaloa, the Chapitos used the same recipe of brutal and relentless violence to assert control in other areas of Mexico. At the direction of OSCAR NOE MEDINA GONZALEZ, a/k/a "Panu," the defendant, Cartel *sicarios* loyal to the Chapitos would travel to areas outside Sinaloa, seize command of local enforcers from Cartel-aligned trafficking organizations and street gangs, and commit violence to intimidate local populations and rival traffickers and ensure Cartel dominance in the area. This process — which these *sicarios* called "cleaning" — was overseen by MEDINA GONZALEZ directly reporting to IVAN ARCHIVALDO GUZMAN SALAZAR, the defendant.

35.     As they moved into new territory, Cartel *sicarios* loyal to the Chapitos used the same brand of widespread violence that had previously effectively enabled the Cartel to secure control in Sinaloa. This violence included kidnapping, torturing, and killing of rival drug traffickers and government officials not willing to accede to the Cartel. Between in or about 2016 and 2022, these *sicarios* "cleaned" — in other words, kidnapped, tortured, and killed rival drug traffickers and government officials — in the Mexican states of Coahuila, Michoacan, Sonora, Tamaulipas, and Chihuahua. These states were important and strategically located areas for purposes of maintaining control over the Cartel's position as the dominant drug trafficking organization in Mexico.

36.      At present, the Cartel is active in more than half of all states in Mexico. The Cartel itself is highly organized and has a sophisticated security apparatus that is armed with military-grade weapons and consists of hundreds of individuals, including those with military-type training, responsible for protecting the Cartel and its leadership at all costs. As an example, on or about January 5, 2023, the Chapitos' security apparatus mobilized in Jesus Maria, Sinaloa, to try to prevent Mexican authorities from arresting Ovidio Guzman Lopez a second time. While this time Mexican authorities successfully arrested Ovidio Guzman Lopez, and seized, among other things, numerous firearms and approximately six bags of fentanyl pills, Cartel *sicarios* loyal to the Chapitos engaged in extensive efforts to prevent the arrest, including drawing the Mexican military into gunfights, killing soldiers, and burning vehicles to create roadblocks. This violence and destruction, which included at least 29 deaths, quickly became known as the "Second Culiacanázo."

37.      The Cartel's operations are not limited to Mexico. The Cartel has the largest international operations of any drug trafficking organization, with a criminal network encompassing nearly every major city from New York to Buenos Aires and a presence in more than 45 countries across the world.

38.      Through its extensive holdings and operations within Mexico and its relationships and distribution network outside Mexico, the Cartel — as a result of the Chapitos' extensive fentanyl trafficking operation — controls the manufacturing and trafficking of the vast majority of the fentanyl imported into the United States, where Cartel associates distribute the lethal drug to cities across the country for consumption by end-users, some of whom are consuming fentanyl unknowingly because the fentanyl is mixed with other drugs or disguised as, for example, legitimate prescription pills. The Cartel's fentanyl trafficking organization imports into the United

States hundreds of kilograms of fentanyl and millions of fentanyl pills each month, by land, air, tunnel, and sea, as described further below. This illicit business is booming. Between in or about 2018 and in or about 2020, for example, a single Cartel trafficker in the Los Angeles area ("CC-1") repatriated to Mexico more than $24 million in narcotics proceeds for the benefit of the Chapitos and the Cartel.

### The Cartel's Fentanyl Trafficking Operation

39.     The Cartel operates a vast fentanyl trafficking operation that integrates each step in the fentanyl trade, from manufacture to distribution. Members and affiliates of the Cartel purchase and import fentanyl precursor chemicals from China directly or through third countries, manufacture fentanyl in laboratories in the mountains of Sinaloa, move that fentanyl across the border into the United States, distribute that fentanyl through various networks operating across the United States, and launder the proceeds back to Mexico. As a critical part of the enterprise, to ensure continuity of these diverse and diffuse operations, the Cartel relies on and directs hundreds of violent, heavily armed *sicarios* to protect the Cartel's fentanyl operations at every step and intimidate others who might attempt to cheat, interfere with, or compete against the Cartel, through kidnapping, torture, and murder using machineguns and other weaponry.

### *The Protection of the Cartel's Fentanyl Trafficking Operation by Violent Sicarios and Corruption*

40.     As set forth above, the Chapitos command a powerful security apparatus comprised of Cartel *sicarios*, who are currently led by IVAN ARCHIVALDO GUZMAN SALAZAR and JESUS ALFREDO GUZMAN SALAZAR, a/k/a "Alfredo," the defendants, and managed day-to-day by OSCAR NOE MEDINA GONZALEZ, a/k/a "Panu," the defendant. Under MEDINA GONZALEZ, who is IVAN ARCHIVALDO GUZMAN SALAZAR's principal deputy, are the Cartel's *sicarios* loyal to the Chapitos, including the two leaders of the Ninis,

14

NESTOR ISIDRO PEREZ SALAS, a/k/a "Nini," and JORGE HUMBERTO FIGUEROA BENITEZ, a/k/a "27," the defendants. PEREZ SALAS and FIGUEROA BENITEZ perpetrate violence on behalf of and at the direction of the Cartel and the Chapitos.

   41. The Cartel uses violence for a variety of reasons, all in furtherance of the overarching goals of constantly increasing the Cartel's power and exerting and maintaining control over fentanyl trafficking. Such acts of violence allow the Cartel to, among other things:

     a. promote and enhance the reputation and position of the Cartel, especially with respect to rival cartels, such as on or about May 27, 2017, when IVAN ARCHIVALDO GUZMAN SALAZAR, JESUS ALFREDO GUZMAN SALAZAR, a/k/a "Alfredo," OSCAR NOE MEDINA GONZALEZ, a/k/a "Panu," and NESTOR ISIDRO PEREZ SALAS, a/k/a "Nini," the defendants, tortured and murdered three members of the Los Zetas, a rival cartel, on the ranch of IVAN ARCHIVALDO GUZMAN SALAZAR;

     b. protect and maintain the Cartel's power and control in territories in Mexico and key fentanyl trafficking routes, including routes across the U.S.-Mexico border, such as in or about 2022, when the Chapitos sent *sicarios* into Ciudad Juarez, a city in Mexico just south of El Paso, Texas, to "clean" rival cartels doing business there;

     c. discipline and punish members and associates of the Cartel who fail to carry out their duties or who are disloyal or disrespectful to the Chapitos, such as in or about 2013, when PEREZ SALAS shot an individual ("Victim-1") who had stolen from JESUS ALFREDO GUZMAN SALAZAR, which shooting was at the direction of JESUS ALFREDO GUZMAN SALAZAR and caused Victim-1 to lose his foot;

     d. intimidate local civilian populations and attack law enforcement and government officials in order to prevent interference with the Cartel's fentanyl trafficking, such as

in or about 2017, when IVAN ARCHIVALDO GUZMAN SALAZAR, JESUS ALFREDO GUZMAN SALAZAR, MEDINA GONZALEZ, and PEREZ SALAS captured, tortured, and killed two Mexican federal law enforcement officers of the Office of the General Prosecutor, and in or about 2022, when Cartel *sicarios* in Ciudad Juarez attacked the local prosecutor's office; and

       e.    protect the Cartel's leadership and other members from arrest and prosecution, such as in or about October 2019 and January 2023, when Ovidio Guzman Lopez was arrested during the First and Second Culiacanázos and, on both occasions, Cartel *sicarios* responded by committing violence in Culiacán.

      42.    In maintaining security for its fentanyl operations, the Cartel relies not only on its *sicarios*, who operate within the Cartel's chain of command, but also on Cartel-aligned groups that partner with the Cartel in the trafficking of fentanyl and other drugs. For example, Cartel *sicarios* in Coahuila have partnered with the Noreste Cartel and Cartel *sicarios* in Chihuahua have partnered with the Artistas Asesinos or Double A gang. In or about August 2022, in Ciudad Juarez, OSCAR NOE MEDINA GONZALEZ, a/k/a "Panu," the defendant, ordered Cartel *sicarios*, in conjunction and coordination with the Artistas Asesinos enforcers, to destroy businesses that belonged to a rival cartel, leading to arsons and shootings that left more than 10 dead and would later be called "Black Thursday."

      43.    These *sicarios* and associated groups use, on a large scale, military-grade weapons to protect the Cartel's operations. These weapons serve as the primary tools for perpetrating violence in Mexico against other traffickers, civilians, and government officials and security forces. These weapons, carried and used by the Cartel's *sicarios*, and at times by other members of the Cartel, including the Chapitos themselves, include armored trucks, bazookas (rocket launchers), grenades and hand-held grenade launchers, and various types of firearms,

ranging from .45 and .38 caliber handguns to AK-47s, AR-15s, and other machineguns. A photograph showing an example of the firearms maintained and used by the Cartel is below:



44.    In the campaign of violence currently being waged by the Cartel and other traffickers for territory in Ciudad Juarez, JUAN PABLO LOZANO, a/k/a "Camaron," the defendant, is a major procurer of weapons for the Cartel, its *sicarios*, and Cartel-aligned groups. He regularly crosses from the United States to Mexico with firearms, including machineguns, often with large firearms hidden on his person. Some of the larger caliber machineguns and grenades smuggled and supplied by PABLO LOZANO have been routed for the Cartel's use in Sinaloa, while some of the smaller caliber pistols smuggled and supplied by PABLO LOZANO have been routed into the Ciudad Juarez jails for use by imprisoned Cartel *sicarios*.

45.    The Cartel also relies on corruption, including cash bribe payments, to maintain the security of its operations and its leadership.

### The Procurement of Fentanyl Precursor Chemicals

46.     The Cartel relies primarily on chemical companies outside of Mexico for obtaining precursor chemicals that are necessary to make fentanyl. China has emerged as the source of the vast majority of these chemicals used by the Cartel to manufacture their fentanyl; in other words, the chemicals enabling the Cartel to produce and flood the United States with lethal fentanyl are coming principally from China.

47.     The Chapitos and their confederates use various means to purchase fentanyl precursor chemicals from chemical and pharmaceutical companies in China, including using brokers in other countries to purchase the precursor chemicals from those companies on the Cartel's behalf. Those brokers also assist with ensuring that the precursor chemicals are successfully transported from China to the Cartel in Mexico.

48.     ANA GABRIELA RUBIO ZEA, a/k/a "Gaby," the defendant, based in Guatemala, is one such broker who works with the Cartel (among other traffickers) to procure precursor chemicals from China for the manufacture of Cartel fentanyl in Mexico. RUBIO ZEA uses her connections to China-based suppliers and chemical manufacturers to procure fentanyl precursor chemicals for the Cartel and to put Cartel traffickers in touch directly with those China-based suppliers, knowing that these chemicals will be used to manufacture fentanyl for ultimate distribution in the United States and elsewhere. RUBIO ZEA told Chinese precursor supplier YONGHAO WU, a/k/a "Tim," the defendant, in an encrypted message, "[W]e are the biggest . . . we are the biggest in Mexico so we can purchase a lot [of precursor chemicals]."

49.     ANA GABRIELA RUBIO ZEA, a/k/a "Gaby," the defendant, has also used her expertise and contacts to ensure that precursors reach their destination without being interdicted by customs officials in Mexico or elsewhere. For example, RUBIO ZEA has arranged for chemicals to be disguised in food containers, or packaged along with legal chemicals, to avoid

detection. On other occasions, RUBIO ZEA has relied on corruption at the border to successfully get the product into the country.

50.     In China, according to the U.S. Department of State, ineffective oversight of the massive chemical and pharmaceutical industries provides an ideal environment for the illicit production of fentanyl and fentanyl precursors. The Chinese chemical companies involved in the illicit production and supply of precursors avoid scrutiny by selling product to middlemen inside China, who, in turn, move the chemicals abroad. Two of these China-based middlemen are KUN JIANG and YONGHAO WU, a/k/a "Tim," the defendants, both of whom supply fentanyl precursor chemicals to ANA GABRIELA RUBIO ZEA, a/k/a "Gaby," the defendant.

51.     KUN JIANG, the defendant, is one of the primary sources of supply in China for ANA GABRIELA RUBIO ZEA, a/k/a "Gaby," the defendant. RUBIO ZEA has purchased kilograms of fentanyl precursor chemicals from JIANG's chemical company in China on behalf of the Cartel. JIANG's company, like other China-based suppliers of fentanyl precursor chemicals, ships its product to Mexico, including by using Chinese air carriers.

52.     YONGHAO WU, a/k/a "Tim," YAQIN WU, a/k/a "Lily," and HUATAO YAO, a/k/a "Yao," the defendants, are another significant source of chemicals for ANA GABRIELA RUBIO ZEA, a/k/a "Gaby," the defendant. YONGHAO WU and YAQIN WU work for YAO, who owns Wuhan Shuokang Biological Technology Ltd., or "SK Biotech," a China-based chemical company that also clandestinely sells fentanyl precursor chemicals to drug traffickers in Mexico. YONGHAO WU, YAQIN WU, and YAO frequently ship fentanyl precursor chemicals to Mexico, including to Mazatlán, a Cartel-controlled city located in Sinaloa, in exchange for payments in cryptocurrency or via cross-border bank transfers. On or about February 9, 2023, for example, YAO inquired of a precursor chemical purchaser whether certain precursors

being shipped to New York City were eventually going to be shipped to Mexico. When the purchaser confirmed, YAO noted that he more typically sent chemicals to Mexico through Germany. On or about February 14, 2023, YAQIN WU explained, in the course of communications to arrange fentanyl shipments, that Mexican authorities are not able to detect that the chemicals come from China, stating that "since we dare to sell this thing, it means that our resources and channels are no problem." YONGHAO WU, YAQIN WU, and YAO also provide assistance to the Cartel with developing what they have described as "efficient preparation methods" for fentanyl manufacturing, including by providing information about exactly what other chemicals are needed to mix with the precursor chemicals in order to produce finished fentanyl for distribution. On or about December 19, 2022, for example, YAQIN WU described what she understood to be the "most cost-effective starting material" for manufacturing fentanyl, detailing how the particular chemicals she offered could be used for fentanyl synthesis.

53.     Like certain other companies in China involved in the illicit supply of fentanyl precursors to drug traffickers, SK Biotech projects a purported air of legitimacy and takes steps to avoid detection and prosecution by law enforcement. On its website, for example, the company advertises itself as a manufacturer of legal raw materials. Those chemicals, however, are principally those that are often used as cutting agents for illegal narcotics, including fentanyl. Moreover, while SK Biotech's headquarters are based in Wuhan, China, the company has a factory based elsewhere in the country, allowing SK Biotech to manufacture illicit chemicals alongside legal raw materials. SK Biotech and similar Chinese chemical companies are nimble and have taken steps such as eliminating or cleaning up to legitimize a particular factory, or even changing their company name, in order to avoid detection or intervention by law enforcement. When shipping their illicit fentanyl precursors, these companies also ensure that the Chinese shipping

company helps disguise the product. On or about March 10, 2023, YAQIN WU, a/k/a "Lily," the defendant, told a buyer of fentanyl precursors, "What you want is a drug, not a normal product, and the normal time for delivery is about 7 days. . . . This cargo is so special that the freight forwarder also needs to carefully disguise it."

### The Manufacturing of Fentanyl

54.     The Cartel uses the precursor chemicals procured from China to manufacture fentanyl at laboratories in Mexico belonging to Cartel members, including the Chapitos, who control and operate a significant percentage of the Cartel's labs.

55.     In or about 2014, the Chapitos began manufacturing fentanyl in a single makeshift lab located within a modest house in Culiacán. Fentanyl precursors, stored in warehouses owned by the Cartel, were transported to the lab under armed guard. Once processed, Cartel workers packaged, transported to Tijuana, and smuggled the finished fentanyl across the U.S.-Mexico border.

56.     Since those early days of the Cartel's fentanyl trade, the Cartel's manufacture of fentanyl has exploded, and the demand for the highly dangerous and potentially lethal drug has grown significantly. That growth has been fueled, at least in part, by the Cartel driving users of other drugs to fentanyl by mixing fentanyl into other drugs to increase their potency. Indeed, as the Cartel's fentanyl trade grew, heroin traffickers for the Cartel began to struggle to sell their product. As a result, Ovidio Guzman Lopez established an outpost in Mexico City, Mexico, where heroin traffickers can go to purchase fentanyl to mix in with their heroin. "Cutting" their product with fentanyl has allowed Cartel heroin traffickers to maintain their customer base, but substantially increases the risk of overdose and death.

57.     The Cartel also now employs skilled chemists — known as "cooks" — who have the expertise to synthesize fentanyl by combining and manipulating multiple different

precursor chemicals. Many of the cooks work in Cartel-controlled clandestine fentanyl labs on ranches owned by high-level members of the Cartel and in smaller houses in and around Culiacán. The Cartel's labs are heavily guarded Cartel assets, protected by armed security. For instance, one clandestine Cartel lab in Sinaloa was located underground with a concealed entrance and elevator used to transport large drums of fentanyl and precursor chemicals. The underground lab contained industrial stoves, pill presses, and other materials used to manufacture large quantities of fentanyl under the protection of Cartel security personnel armed with automatic rifles.

58.     The day-to-day control over such labs varies across the Cartel. The Chapitos directly control some of those labs, such as the labs in which CARLOS LIMON, the defendant, has worked, and others are maintained by the Chapitos' closest security personnel, including NESTOR ISIDRO PEREZ SALAS, a/k/a "Nini," and JORGE HUMBERTO FIGUEROA BENITEZ, a/k/a "27," the defendants. Other fentanyl traffickers who work for the Cartel are permitted by the Chapitos to run their own networks of labs, including LIMON, JESUS TIRADO ANDRADE, CARLOS OMAR FELIX GUTIERREZ, and SILVANO FRANCISCO MARIANO, a/k/a "Rayo," the defendants. All of these labs, whether overseen directly by the Chapitos, by Cartel *sicarios* loyal to the Chapitos, or by Cartel traffickers who operate in areas controlled by the Chapitos, source precursors from the Chapitos and employ the same shared group of cooks who make the fentanyl. Unlike other dangerous narcotics that can take months and many acres of land to grow, fentanyl can be manufactured in a small lab over the course of just a few days. In one day alone, a Cartel cook can manufacture in excess of 100,000 pills using pill press machines such as the pill press pictured below, which was used by LUIS JAVIER BENITEZ ESPINOZA, a/k/a "El Fourteen," the defendant:



59.     At the Cartel's labs, fentanyl is manufactured in both powder and pill form. In either form, the fentanyl is sometimes mixed with other substances, some benign and some with other psychotropic effects, before being imported into the United States. The purity of the Cartel's fentanyl varies greatly depending on the method and skill of the particular manufacturer. In spring 2022, Ovidio Guzman Lopez noted that he was working to centralize all fentanyl manufacturing in Sinaloa, effectively establishing a monopoly for the Cartel over the fentanyl market in Mexico. As part of that effort, the Cartel is trying to manufacture the most potent fentanyl and to sell it in the United States at the lowest price.

60.     While the Cartel possesses the technical capability to test, and does test, fentanyl purity in a lab setting, certain Cartel traffickers have also resorted on occasion to cruder and more dangerous methods. NESTOR ISIDRO PEREZ SALAS, a/k/a "Nini," and JORGE HUMBERTO FIGUEROA BENITEZ, a/k/a "27," the defendants, for example, have tested fentanyl on individuals who were tied down, and three cooks in a fentanyl lab that they controlled

died after sampling the product. More recently, in or about 2022, PEREZ SALAS and FIGUEROA BENITEZ experimented on a woman whom they were supposed to shoot ("Victim-2"). Instead of shooting Victim-2, however, PEREZ SALAS and FIGUEROA BENITEZ injected her repeatedly with a lower potency of fentanyl until she ultimately overdosed and died. Similarly, when an addict died testing Cartel fentanyl produced by CARLOS LIMON, the defendant, LIMON sent the batch of fentanyl to the United States anyway.

### The Trafficking of Fentanyl to and Distribution Within the United States

61.     Trafficking of the finished fentanyl into the United States is a primary purpose of the Cartel and one of its most lucrative endeavors. Members of the Cartel traffic fentanyl themselves and, in Chapitos-controlled areas, the Chapitos permit fentanyl trafficking by others so long as the fentanyl trafficked was manufactured in labs controlled by the Chapitos and the traffickers pay fees to the Chapitos for operating within their territory.

62.     The methods through which Cartel traffickers import fentanyl across the border into the United States are diverse. Most often, the Cartel's fentanyl crosses U.S. borders at ports of entry, for example, concealed in secret compartments of cars, disguised amongst goods in tractor-trailers, hidden in luggage on planes, obscured through fake paperwork in shipping containers, or secreted on or in the bodies of drug mules. The Cartel relies on the impossibility of inspecting every item that crosses the U.S.-Mexico border, and also seeks to exploit corruption on both sides of the border. In fact, prior to one deal for fentanyl pills in the United States, Ovidio Guzman Lopez spoke to LIBORIO NUNEZ AGUIRRE, a/k/a "Karateca," the defendant, and asserted that law enforcement between Culiacán and Tijuana would be paid by the Chapitos to ensure fentanyl pills could be moved without any problems.

63.     As an example of how the Cartel imports its fentanyl into the United States, in or about August 2021, in or around El Paso, Texas, a high-ranking member of a Chapitos-

aligned gang from Ciudad Juarez introduced a corrupt border official and Cartel co-conspirator ("CC-2") to JUAN PABLO LOZANO, a/k/a "Camaron," the defendant, one of the Cartel's fentanyl and weapons smugglers, as described above. Over the ensuing approximately 12 months, CC-2, in exchange for payment from the Cartel, facilitated PABLO LOZANO's trafficking by permitting PABLO LOZANO to cross into and out of the United States as he desired during CC-2's shift, which began each night at approximately 10:00 p.m. During CC-2's shift, PABLO LOZANO also smuggled fentanyl pills through the port of entry with "mules." American women, recruited by PABLO LOZANO, would ingest or insert into their bodies up to approximately 2,000 packaged fentanyl pills on each of three trips across the border each night. PABLO LOZANO also maintained a house just outside of El Paso, where he would bring the fentanyl smuggled across the border during CC-2's shift. From the house, PABLO LOZANO sold the Chapitos' fentanyl in bulk to customers in, among other cities, Albuquerque, New Mexico, and traded fentanyl for cars that could be re-sold in Mexico or used to smuggle more fentanyl across the border.

64.     The Cartel also imports its fentanyl into the United States away from ports of entry by, among other means, boats, private planes, tunnels, and ATVs. For example, a roughly one-mile long tunnel dug underneath the U.S.-Mexico border in Arizona has been used by Cartel traffickers carrying fentanyl loads. Originating under a small office on the Mexican side of the border, this tunnel leads directly into a small office on the U.S. side of the border, allowing Cartel traffickers to come and go freely from both locations as purported employees of either office, without raising any suspicion. This tunnel is one of many secret tunnels that provide quick and covert passage for Cartel traffickers, who must crawl through these small tunnels on their knees while carrying fentanyl loads.

65.     Once the Cartel's fentanyl is crossed into the United States, Cartel traffickers maintain designated stash locations where the fentanyl is stored, and the Cartel's U.S.-based distribution network then sells the fentanyl wholesale for retail distribution throughout the United States, including in New York City and elsewhere along the east coast. Most of these Cartel stash locations are clustered in U.S. metropolitan areas along the border in, for example, Southern California, El Paso, and Phoenix, from where the Cartel's fentanyl is redistributed across the nation, including to the Bronx, New York, and other destinations along the east coast.

66.     In Los Angeles, for example, traffickers working Ovidio Guzman Lopez, the Chapito principally responsible for overseeing the Cartel's fentanyl manufacturing and distribution business, maintain houses and storage units that have been used to store and then ship more than 80 kilograms of fentanyl. In or about 2018, traffickers working for Ovidio Guzman Lopez, along with NOEL PEREZ LOPEZ, a/k/a "Tio" and SAMUEL LEON ALVARADO, the defendants, who were hiding the Cartel's fentanyl in a hotel room, had to move approximately 20 kilograms of fentanyl out of the room after a housekeeper observed the narcotics. Fearing that they could be followed, the traffickers buried the fentanyl at their stash house in Los Angeles's Paramount neighborhood. Slowly, over time, these traffickers dug up the fentanyl and shipped it, by U.S. commercial carriers, to bulk customers in, among other places, Ohio, Michigan, and Pennsylvania.

67.     Large quantities of the Cartel's fentanyl are also smuggled from Mexico into and distributed out of Phoenix. Hundreds of kilograms of Cartel fentanyl and hundreds of thousands of Cartel fentanyl pills are regularly seized by law enforcement in and around Phoenix. For example, in a single day, on or about August 19, 2022, approximately 41.2 kilograms of fentanyl powder and 630,000 fentanyl pills, as well as approximately $22,000 in cash, were seized

from a single stash house in Phoenix, as displayed in the picture below. The fentanyl pills and kilograms of fentanyl belonged to the Cartel and included stamps with two of the Chapitos' signature symbols: the words "Chapiza" and "Raton," which are a common name for the Chapitos and the well-known alias for Ovidio Guzman Lopez, respectively.



68.     Fentanyl trafficking is extremely profitable for the Cartel. As noted above, fentanyl is inexpensive and easy for the Cartel to make. The Cartel can purchase approximately one kilogram of fentanyl precursor from China for approximately $800. In turn, the Cartel can manufacture approximately 415,000 fentanyl pills, or four kilograms of fentanyl powder, from just that one kilogram. The fentanyl can then be sold wholesale in the United States for as low as 50 cents a pill, depending on the particular city or area in which it is sold. On the street, dealers can turn those pills into profit, demanding as much as three dollars per pill in New York City. The Chapitos, therefore, can turn one kilogram of fentanyl precursor into enough finished fentanyl from which they can make a profit ranging from approximately 200 to 800 times the amount it costs them to purchase the precursor chemicals. Given the volume of the Cartel's distribution in

the United States, with millions of the Cartel's fentanyl pills and kilograms being sold on a regular basis each month, fentanyl trafficking has become one of the Cartel's most lucrative businesses, netting many millions in profit every year.

69.     At times, the Cartel's wholesale fentanyl distribution business in the United States leads to the Chapitos and their confederates carrying out violence in the United States to protect and maintain their operations. For example, in or about July 2019, NOEL PEREZ LOPEZ, a/k/a "Tio," and SAMUEL LEON ALVARADO, the defendants, ordered CC-1 to murder an individual ("Victim-3") who had purchased fentanyl from Ovidio Guzman Lopez, but refused to pay for the drugs. CC-1 did as directed and hired another individual to shoot Victim-3. On or about July 23, 2019, Victim-3 was shot but survived.

### The Laundering of Fentanyl Proceeds

70.     The Cartel relies on various schemes and methods to ensure that the Chapitos and their confederates ultimately receive the highly lucrative proceeds generated from their fentanyl trafficking activities in the United States.

71.     Traditionally, Mexican cartels, including the Sinaloa Cartel, relied on shipments of bulk cash moving from the United States, where drugs were sold, back to Mexico, where the traffickers lived. This method involves, however, both risk of seizure by law enforcement and the impracticalities of paper currency that is difficult to move, store, and protect. In addition, advances in anti-money laundering by governments around the world have made simply depositing this cash into the international banking system substantially more challenging for traffickers.

72.     In light of these challenges, the Cartel has developed other means of moving fentanyl proceeds from the United States back to Mexico. The methods for these money laundering schemes are diverse, and allow the Chapitos and their confederates to amass vast sums of wealth

in diversified assets including, for example, off-shore bank accounts, real estate, physical goods, and digital currencies.

73.     The value of funds being laundered to Mexico for the Cartel is staggering. As noted above, over the course of approximately two years, for example, a single Cartel trafficker in the United States, CC-1, assisted in the laundering of more than $24 million in narcotics proceeds belonging to Ovidio Guzman Lopez by providing to Cartel money launderers in the United States approximately $15 million and by sending approximately $9 million in bulk cash to Mexico hidden in secret compartments in cars. Another Cartel trafficker, based in Phoenix, over the course of just approximately six months in or about 2021 and 2022, delivered to launderers stationed at a bar in Phoenix tens of thousands of dollars of narcotics proceeds on a weekly basis.

74.     JULIO MARIN GONZALEZ, MARIO ALBERTO JIMENEZ CASTRO, a/k/a "Kastor," and SERGIO DUARTE FRIAS, the defendants, are three of the money launderers who work with the Cartel to launder its fentanyl proceeds, enabling the Cartel to reap the massive profits from its fentanyl sales in the United States while avoiding detection, and in return receiving a cut of the proceeds for their efforts.

75.     One such scheme, operated with the support of IVAN ARCHIVALDO GUZMAN SALAZAR, the defendant, is a trade-based money laundering operation run by JULIO MARIN GONZALEZ, the defendant. MARIN GONZALEZ, a Mexican citizen, owns multiple cellphone stores in Mexico, including in Culiacán, Sinaloa, and Mazatlán, which he uses in connection with his money laundering operation involving fentanyl proceeds that belong to the Cartel. Specifically, MARIN GONZALEZ purchases U.S. dollars in bulk from Mexico-based Cartel traffickers at a discount in exchange for Mexican pesos. The U.S. dollars are proceeds that Cartel traffickers generated from sales of fentanyl (and other narcotics) in the United States,

including in New York City, Phoenix, San Diego, Los Angeles, Newark, and Philadelphia. After paying the Cartel traffickers in Mexican pesos, MARIN GONZALEZ directs his U.S.-based couriers to retrieve the traffickers' drug proceeds at specific locations in the United States, including in Phoenix and New York City. MARIN GONZALEZ's U.S.-based couriers, at MARIN GONZALEZ's direction, then use those drug proceeds to purchase cellphones in bulk in the United States. The cellphones are then smuggled into Mexico and delivered to MARIN GONZALEZ's cellphone stores, where MARIN GONZALEZ sells the cellphones at an inflated price.

76.     The Cartel also uses cryptocurrency-based money laundering operations to ensure that proceeds generated from the sale of its fentanyl in the United States are provided to the Cartel in Mexico. For example, MARIO ALBERTO JIMENEZ CASTRO, a/k/a "Kastor," and SERGIO DUARTE FRIAS, the defendants, operate a U.S.-based money laundering organization that uses cryptocurrency to launder Cartel drug money to Mexico from the United States, including from New York City, Boston, Denver, Nashville, Omaha, and Salt Lake City. Since at least in or about August 2022, JIMENEZ CASTRO and DUARTE FRIAS, who report directly to a deputy of IVAN ARCHIVALDO GUZMAN SALAZAR, the defendant, have directed individuals to pick up money from various traffickers in the United States, and to then deposit that cash into various cryptocurrency wallets controlled by DUARTE FRIAS or other high-level members of his organization. That cryptocurrency is then converted into regular currency and is able to be withdrawn by JIMENEZ CASTRO, DUARTE FRIAS, or other members of their money laundering organization, which currency can then be provided directly to the Chapitos and their confederates in Mexico. Alternatively, once the fentanyl proceeds are deposited into cryptocurrency wallets, that cryptocurrency can also be used directly to purchase additional fentanyl, without the need to convert the cryptocurrency back into cash. Between in or about

August 2022 and February 2023, U.S.-based couriers, acting at the direction of JIMENEZ CASTRO and DUARTE FRIAS, retrieved more than $869,000 in narcotics proceeds, which was then laundered via cryptocurrency for the Cartel. Approximately $120,000 of the drug proceeds that JIMENEZ CASTRO and DUARTE FRIAS worked to launder, seized by the DEA in Boston, Massachusetts, is pictured below:



**Acts in Furtherance of the
Cartel's Fentanyl Trafficking Operation**

77.     In furtherance of the Cartel's fentanyl trafficking operation led by the Chapitos, the defendants have engaged in the acts described below, among others.

78.     In or about 2014, the three Chapitos brothers, IVAN ARCHIVALDO GUZMAN SALAZAR and JESUS ALFREDO GUZMAN SALAZAR, a/k/a "Alfredo," the

defendants, and Ovidio Guzman Lopez, began manufacturing fentanyl at a clandestine laboratory in Durango, Mexico that had previously been used to produce methamphetamine.

79.     In or about early 2017, IVAN ARCHIVALDO GUZMAN SALAZAR, JESUS ALFREDO GUZMAN SALAZAR, a/k/a "Alfredo," OSCAR NOE MEDINA GONZALEZ, a/k/a "Panu," and NESTOR ISIDRO PEREZ SALAS, a/k/a "Nini," the defendants, captured, tortured, and killed two Mexican federal law enforcement officers of the Office of the General Prosecutor, the Procuraduría General de la República ("PGR").[2] Members of the Ninis located one of these officers ("Victim-4") based on information provided by PEREZ SALAS and kidnapped him from his vehicle while he was exiting the airport in Culiacán. The Ninis brought Victim-4 to the Navolato, Sinaloa ranch of IVAN ARCHIVALDO GUZMAN SALAZAR, where he was tortured until IVAN ARCHIVALDO GUZMAN SALAZAR and JESUS ALFREDO GUZMAN SALAZAR arrived the following day. Upon their arrival, IVAN ARCHIVALDO GUZMAN SALAZAR and JESUS ALFREDO GUZMAN SALAZAR interrogated Victim-4 and ultimately shot him in the head. Members of the Ninis kidnapped the second official ("Victim-5") and similarly brought him to the Navolato ranch of IVAN ARCHIVALDO GUZMAN SALAZAR, where Victim-5 was interrogated in the presence of IVAN ARCHIVALDO GUZMAN SALAZAR, JESUS ALFREDO GUZMAN SALAZAR, MEDINA GONZALEZ, and PEREZ SALAS. For approximately two hours, members of the Ninis tortured Victim-5 by inserting a corkscrew into Victim-5's muscles, ripping it out of his muscles, and placing hot chiles in his open wounds and nose. Following this torture, IVAN ARCHIVALDO GUZMAN SALAZAR shot Victim-5. The bodies of Victim-4 and Victim-5 were dumped near a particular motel off Mexican Federal Highway 15 outside Navolato.

---

[2] The PGR is the predecessor organization to the FGR, the present name for the Office of the General Prosecutor.

80.     In or about May 2017, IVAN ARCHIVALDO GUZMAN SALAZAR, JESUS ALFREDO GUZMAN SALAZAR, a/k/a "Alfredo," OSCAR NOE MEDINA GONZALEZ, a/k/a "Panu," and NESTOR ISIDRO PEREZ SALAS, a/k/a "Nini," the defendants, captured three members of the rival Los Zetas drug cartel in the mountains near the border of Sinaloa and Durango ("Victim-6," "Victim-7," and "Victim-8"). At the orders of IVAN ARCHIVALDO GUZMAN SALAZAR and JESUS ALFREDO GUZMAN SALAZAR, members of the Ninis, including PEREZ SALAS, tortured Victim-6, Victim-7, and Victim-8, including with electrocution, in order to obtain information about Los Zetas' associations with other rival cartels. When the interrogations were complete and in the presence of JESUS ALFREDO GUZMAN SALAZAR, MEDINA GONZALEZ, and PEREZ SALAS, on or about May 27, 2017, IVAN ARCHIVALDO GUZMAN SALAZAR shot Victim-6, Victim-7, and Victim-8, killing them.

81.     Between in or about 2017 and in or about 2021, Ovidio Guzman Lopez, and NOEL PEREZ LOPEZ, a/k/a "Tio" and SAMUEL LEON ALVARADO, the defendants, worked with CC-1, who was based in the United States, to maintain multiple premises in the Los Angeles metropolitan area for the storage and wholesale distribution of the Cartel's fentanyl sourced from the Chapitos. In total, Ovidio Guzman Lopez, PEREZ LOPEZ, and LEON ALVARADO sent approximately 80 kilograms of fentanyl to CC-1 in the United States for storage and distribution. CC-1 sold some of the fentanyl locally in Los Angeles, and using commercial parcel carriers, shipped fentanyl to, among other places, Ohio, Michigan, and Pennsylvania. As noted above, in or about July 2019, PEREZ LOPEZ and LEON ALVARADO ordered CC-1 to murder Victim-3, who had purchased fentanyl from Ovidio Guzman Lopez but refused to pay. CC-1 did as directed and hired another individual to shoot Victim-3. On or about July 23, 2019, Victim-3 was shot but survived. On or about May 28, 2019, approximately 10 kilograms of fentanyl belonging to Ovidio

Guzman Lopez, PEREZ LOPEZ, and LEON ALVARADO were seized by the DEA from two storage units used by the Chapitos' operation in California. When CC-1 refused to pay a debt owed to the Cartel, Ovidio Guzman Lopez, PEREZ LOPEZ, and LEON ALVARADO had CC-1's brother kidnapped, detaining him for approximately three months and, on one occasion, torturing him with waterboarding to ascertain the location of CC-1. A photograph of the narcotics seized from the two storage units is below:



82.     Between in or about 2018 and in or about 2021, CC-1 laundered approximately $24 million belonging to Ovidio Guzman Lopez, and NOEL PEREZ LOPEZ, a/k/a "Tio" and SAMUEL LEON ALVARADO, the defendants. For approximately $6 million of those funds, CC-1 coordinated with LEON ALVARADO by using photos of serial numbers on specific U.S. dollar bills associated with the bulk cash movements as proof of ownership of the funds, so that LEON ALVARADO could retrieve in Mexico the same amount of money that CC-1 had

delivered to the launderers in the United States. Approximately $9 million in Cartel proceeds was transported in cars driven by CC-1's associates.

83.     In or about 2019, IVAN ARCHIVALDO GUZMAN SALAZAR, JESUS ALFREDO GUZMAN SALAZAR, a/k/a "Alfredo," OSCAR NOE MEDINA GONZALEZ, a/k/a "Panu," and NESTOR ISIDRO PEREZ SALAS, a/k/a "Nini," the defendants, met in Mexico to discuss the procurement of fentanyl precursors from China for use in the Cartel's fentanyl manufacturing. During the meeting, IVAN ARCHIVALDO GUZMAN SALAZAR identified which traffickers would be primarily responsible for the importation of precursors, and JESUS ALFREDO GUZMAN SALAZAR recommended particular airlines for that importation, touting the Chapitos' connections in Mexican customs who would allow the entry of the chemicals upon arrival. MEDINA GONZALEZ stated that he would disseminate the information about the planned operation to others in the organization.

84.     On or about September 10, 2019, Mexican authorities stopped and seized a tractor-trailer in Mexico City carrying approximately 16 kilograms of finished fentanyl and approximately 32 kilograms of fentanyl precursor chemicals that belonged to JESUS ALFREDO GUZMAN SALAZAR, a/k/a "Alfredo," and OSCAR NOE MEDINA GONZALEZ, a/k/a "Panu," the defendants. These drugs had arrived in Mexico by plane from China to the Mexico City International Airport and were being transported to Sinaloa for further processing before being trafficked into the United States.

85.     In or about October 2019, when Ovidio Guzman Lopez was briefly taken into custody during the First Culiacanázo, the Chapitos ordered all available Cartel *sicarios* to converge on Culiacán to fight for the release of Ovidio Guzman Lopez. OSCAR NOE MEDINA GONZALEZ, a/k/a "Panu," the defendant, personally commanded members of the Ninis,

assigning them to, among other places, the Sinaloa airport, where they were instructed to shoot down with bazookas and grenade launchers any planes or helicopters attempting to take off or land. IVAN ARCHIVALDO GUZMAN SALAZAR, the defendant, ignored his normal operational security practice of never communicating over public short-wave radio frequencies and repeatedly used those frequencies to personally command his *sicarios* to kill any government or military official who could be found. Ultimately, the Mexican government released Ovidio Guzman Lopez after the widespread armed violence by Chapitos-controlled *sicarios* resulted in significant destruction and approximately 13 deaths, including a member of the Mexican National Guard.

86.     In or about 2020, Ovidio Guzman Lopez maintained a complex in Culiacán where drugs and firearms were stored. From that complex, Ovidio Guzman Lopez and another member of the Cartel would send drugs, including approximately 400,000 fentanyl pills, by plane to the United States.

87.     In or about June 2020, CC-1 sold approximately two kilograms of fentanyl and other narcotics in Los Angeles that he had received from Ovidio Guzman Lopez, and NOEL PEREZ LOPEZ, a/k/a "Tio" and SAMUEL LEON ALVARADO, the defendants, to a particular customer based in the New York City area. This customer drove the fentanyl and other narcotics across the country to Suffolk County, New York, transiting through New York City. On or about June 29, 2020, law enforcement arrested the customer and seized the two kilograms of fentanyl and other narcotics.

88.     On or about August 22, 2020, the DEA seized approximately 53 kilograms of fentanyl precursor chemicals from three packages aboard a cargo airplane that had arrived in Anchorage, Alaska from Hong Kong, China. The precursors belonged to JESUS ALFREDO

GUZMAN SALAZAR, a/k/a "Alfredo," and OSCAR NOE MEDINA GONZALEZ, a/k/a "Panu," the defendants, and were destined for Mexico City, where they were to be transported to Sinaloa to be manufactured into finished fentanyl before being trafficked to Tijuana and then into the United States for the Cartel.

89.     In or about September 2021, ANA GABRIELA RUBIO ZEA, a/k/a "Gaby," the defendant, purchased approximately 25 kilograms of fentanyl precursor chemicals from KUN JIANG, the defendant, and his company in China, Suzhou Xiaoli Pharmatech Co., Ltd., on behalf of the Cartel in Culiacán. The chemicals were flown from China to Mexico, and arrived in Guadalajara, Mexico on or about September 2, 2021. The 25-kilogram load was seized by Mexican law enforcement officials at the Guadalajara airport, as pictured below:



90.     In or about March and April 2022, LIBORIO NUNEZ AGUIRRE, a/k/a "Karateca," the defendant, negotiated the sale in the United States of approximately 70,000

fentanyl pills that NUNEZ AGUIRRE had trafficked into the United States on behalf of the Cartel. During negotiations for the sale of those drugs, NUNEZ AGUIRRE stated that the fentanyl pills belonged to the Chapitos and that he could sell up to 500,000 fentanyl pills at one time. NUNEZ AGUIRRE also stated that he was the godfather to IVAN ARCHIVALDO GUZMAN SALAZAR and JESUS ALFREDO GUZMAN SALAZAR, a/k/a "Alfredo," the defendants, and he showed photographs to others taking part in the negotiations of planes and gold-plated firearms belonging to the Chapitos. On or about March 17, 2022, an associate working for NUNEZ AGUIRRE crossed into the United States from Mexico, picked up approximately 20,000 fentanyl pills belonging to NUNEZ AGUIRRE from a stash location, and passed those pills to another associate working for NUNEZ AGUIRRE in the United States. The U.S.-based associate then delivered a brown paper bag containing the 20,000 fentanyl pills to a buyer inside a Mexican restaurant in a strip mall in Oceanside, California, in exchange for approximately $20,000. On or about April 13, 2022, in Los Angeles, pursuant to the above-described negotiations, NUNEZ AGUIRRE arranged for another associate to deliver to a buyer a burgundy backpack containing approximately 50,000 fentanyl pills belonging to NUNEZ AGUIRRE in the same Mexican restaurant in Oceanside, in exchange for approximately $50,000. The pills from both fentanyl sales were subsequently seized by the DEA.

91.     In or about May 2022, Ovidio Guzman Lopez met with other Cartel members to discuss fentanyl trafficking on a remote farm in Sinaloa guarded by approximately 40 men with machineguns and approximately six armored trucks with machineguns mounted to their roofs. During the meeting, Ovidio Guzman Lopez noted that he was working to centralize fentanyl manufacturing in Sinaloa, where the Chapitos had most control. Ovidio Guzman Lopez further stated that the DEA was concentrating anti-narcotics activity on fentanyl, noting that users of

fentanyl can die if a mixture of fentanyl is "off." Ultimately, Ovidio Guzman Lopez agreed to sell fentanyl to be delivered in Los Angeles, saying he would accept payment in Mexico City.

92.     In or about June and July 2022, NESTOR ISIDRO PEREZ SALAS, a/k/a "Nini," and JORGE HUMBERTO FIGUEROA BENITEZ, a/k/a "27," the defendants, negotiated the sale of fentanyl that PEREZ SALAS and FIGUEROA BENITEZ had previously imported into Los Angeles. In a meeting on or about June 22, 2022, PEREZ SALAS described that he operated his own fentanyl labs where the fentanyl for sale had been produced, and FIGUEROA BENITEZ reported that three fentanyl "cooks" from that lab had recently died from sampling the product because it was so potent. On or about July 16, 2022, at another meeting, PEREZ SALAS and FIGUEROA BENITEZ discussed forcing a woman to overdose on fentanyl and FIGUEROA BENITEZ described shooting the limb off an individual with a .50 caliber machinegun. Both meetings were guarded by men with machineguns and approximately 10 armored vehicles with mounted .50 caliber machineguns. Examples of those heavily armed guards are pictured below:

 

On or about June 3, 2022, in Los Angeles, approximately 2.2 kilograms of fentanyl belonging to PEREZ SALAS and FIGUEROA BENITEZ were sold in exchange for approximately $22,000. On or about July 7, 2022, in Los Angeles, approximately three kilograms of fentanyl belonging to PEREZ SALAS and FIGUEROA BENITEZ were sold in exchange for approximately $33,000. The Chapitos' fentanyl sold on or about June 3, 2022, and July 7, 2022, was subsequently seized by the DEA.

93.     Between in or about August 2021 and in or about August 2022, JUAN PABLO LOZANO, a/k/a "Camaron," the defendant, and a co-conspirator inside the United States ("CC-3"), with the approval of IVAN ARCHIVALDO GUZMAN SALAZAR and OSCAR NOE MEDINA GONZALEZ, a/k/a "Panu," the defendants, trafficked fentanyl into El Paso from Ciudad Juarez and smuggled bulk cash proceeds and weapons back into Mexico. Over time, CC-3 and PABLO LOZANO increased the amount trafficked from approximately 1,000 fentanyl pills per month to approximately 50,000 pills per month. On one occasion, CC-3 brought approximately $900,000 in cash belonging to IVAN ARCHIVALDO GUZMAN SALAZAR, which represented fentanyl proceeds from New York City, back to Ciudad Juarez.

94.     On or about September 2, 2022, YONGHAO WU, a/k/a "Tim," the defendant, sold approximately six kilograms of fentanyl precursor in exchange for approximately $5,000 in Bitcoin. YONGHAO WU shipped the fentanyl precursor from China directly to the United States, where it ultimately arrived in Manhattan, New York. YONGHAO WU's fentanyl precursor was subsequently seized by the DEA.

95.     From at least in or about May 2022 through in or about early January 2023, JULIO MARIN GONZALEZ, the defendant, as part of his money laundering activities in coordination with, among other Cartel members, the Chapitos, purchased from Mexico-based drug

traffickers a total of approximately $1.3 million in narcotics proceeds in the United States, which he then used to purchase cellphones in bulk that he smuggled across the border into Mexico. MARIN GONZALEZ regularly travels to the United States and discussed money laundering and fentanyl trafficking at a meeting in Manhattan, New York, on or about November 17 and 18, 2022.

96.     In addition to money laundering, JULIO MARIN GONZALEZ, the defendant, also distributes fentanyl sourced from the Cartel, including in exchange for money that he then uses to buy cellphones that are smuggled into Mexico. On or about October 27, 2022, in San Diego, MARIN GONZALEZ and his primary source of fentanyl supply, ALAN GABRIEL NUNEZ HERRERA, the defendant, facilitated the sale of approximately 20,000 fentanyl pills manufactured by the Cartel in exchange for approximately $14,500. On or about November 3, 2022, in Los Angeles, MARIN GONZALEZ and NUNEZ HERRERA facilitated the sale of approximately five kilograms of fentanyl powder manufactured by the Cartel in exchange for approximately $65,000. Those fentanyl pills and kilograms were subsequently seized by the DEA.

97.     From on or about August 25, 2022, through on or about December 5, 2022, at the direction of MARIO ALBERTO JIMENEZ CASTRO, a/k/a "Kastor," and SERGIO DUARTE FRIAS, the defendants, a total of approximately $869,000 in narcotics proceeds was picked up by couriers from drug traffickers located in various cities in the United States. That money was then deposited, at JIMENEZ CASTRO and DUARTE FRIAS's direction, into cryptocurrency wallets controlled by DUARTE FRIAS and other high-level members of his money laundering organization, which services the Cartel by repatriating fentanyl proceeds from the United States back to Mexico. For example, on or about August 25, 2022, at the direction of JIMENEZ CASTRO and DUARTE FRIAS, approximately $20,900 in narcotics proceeds was picked up from a drug trafficker in Denver, Colorado and deposited into a cryptocurrency wallet

controlled by DUARTE FRIAS. Similar transactions occurred on or about September 14 and 28, 2022, and on or about October 5, 2022, in Denver and Nashville, Tennessee. And on or about December 5, 2022, approximately $80,000 in narcotics proceeds was picked up by a courier in Manhattan, New York, and deposited into a cryptocurrency wallet controlled by DUARTE FRIAS.

98.     In or about September 2022, LUIS JAVIER BENITEZ ESPINOZA, a/k/a "El Fourteen," the defendant, began negotiating the sale of fentanyl pills to a buyer in the United States. During those negotiations, BENITEZ ESPINOZA said that he worked for the "Chapitos" and specifically discussed his prior work with IVAN ARCHIVALDO GUZMAN SALAZAR and OSCAR NOE MEDINA GONZALEZ, a/k/a "Panu," the defendants. On or about December 28, 2022, in exchange for wire transfers amounting to approximately $4,600, BENITEZ ESPINOZA provided approximately 10,000 fentanyl pills to couriers who brought those pills to San Diego where, on or about January 24, 2023, the pills were provided to a buyer. The fentanyl pills were subsequently seized by the DEA.

99.     Starting in or about November 2022, CARLOS OMAR FELIX GUTIERREZ and SILVANO FRANCISCO MARIANO, a/k/a "Rayo," the defendants, began negotiating a sale of the Cartel's fentanyl in the United States. During those negotiations, FELIX GUTIERREZ and FRANCISCO MARIANO discussed that they operated labs for the production of fentanyl, and that all of the fentanyl precursors are purchased from the Chapitos, who receive the chemicals from China. FELIX GUTIERREZ and FRANCISCO MARIANO also discussed that they use the same cooks as the Chapitos to manufacture the fentanyl in their labs. On or about January 17, 2023, in the parking lot of a large retail store in San Diego, FELIX GUTIERREZ and FRANCISCO MARIANO arranged for an associate to deliver to a buyer a shipping envelope containing approximately one kilogram of fentanyl belonging to FELIX GUTIERREZ and

FRANCISCO MARIANO, in exchange for approximately $11,500. The approximately one kilogram of fentanyl was subsequently seized by the DEA.

100.    In or about November 2022, CARLOS LIMON, the defendant, in Mexico, tested the purity of fentanyl that he and other cooks had recently manufactured for the Cartel by having an individual addicted to the drug inject a sample of this batch. The individual died upon injection, but the Cartel nevertheless went forward with distributing the batch.

101.    In or about January 2023, JULIO MARIN GONZALEZ, the defendant, met with one of his main sources of fentanyl supply within the Cartel, JESUS TIRADO ANDRADE, the defendant, who operates fentanyl labs in Sinaloa for the Cartel. During this meeting, MARIN GONZALEZ and TIRADO ANDRADE discussed opening a new clandestine fentanyl lab in Guatemala. On or about January 11, 2023, in the parking lot of a shopping center in Downey, California, MARIN GONZALEZ arranged for an associate to deliver to a buyer a white plastic bag containing approximately one kilogram of Cartel fentanyl manufactured by TIRADO ANDRADE. Later that day, another associate working at MARIN GONZALEZ's direction met with the buyer and received, on MARIN GONZALEZ's behalf, approximately $11,500 as payment for the one kilogram of fentanyl. The kilogram of fentanyl was subsequently seized by the DEA.

102.    Starting in or about December 2022, SERGIO DUARTE FRIAS, the defendant, began negotiating the sale of a sample of fentanyl in the United States in furtherance of a larger fentanyl trafficking transaction. On or about January 9, 2023, DUARTE FRIAS agreed to sell 10,000 fentanyl pills in exchange for $5,000, and one kilogram of fentanyl powder for $15,000. On or about January 27, 2023, in the parking lot of a large retail store in Burbank, California, DUARTE FRIAS arranged for an associate to deliver to a buyer a backpack containing

approximately 10,000 fentanyl pills and a package containing approximately one kilogram of fentanyl powder. The fentanyl pills and powder were subsequently seized by the DEA.

103.    In or about February 2023, YAQIN WU, a/k/a "Lily," and HUATAO YAO, a/k/a "Yao," the defendants, began negotiating the sale of fentanyl precursor to Manhattan, New York. On or about February 26, 2023, YAQIN WU and YAO received approximately $5,000 in cryptocurrency as advance payment for five kilograms of fentanyl precursor that, after delivery in Manhattan, was to be shipped to Mexico for the manufacture of fentanyl. On or about March 14, 2023, five kilograms of fentanyl precursor were delivered in Manhattan, New York, and were subsequently seized by the DEA.

104.    In or about March 2023, ALAN GABRIEL NUNEZ HERRERA, the defendant, negotiated the sale of multiple kilograms of Cartel fentanyl in the United States. As part of those discussions, on or about March 19, 2023, NUNEZ HERRERA arranged for an associate to deliver approximately nine kilograms of fentanyl powder in Los Angeles. The fentanyl powder, which was subsequently seized by the DEA, is pictured below:



## STATUTORY ALLEGATIONS

### Count One
### (Continuing Criminal Enterprise)

105.   The allegations contained in paragraphs 1 through 104 of this Indictment are incorporated as though fully set forth herein.

106.   From at least in or about 2014, up to and including on or about the date of the filing of this Indictment, in the Southern District of New York, Mexico, and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular State or district, IVAN ARCHIVALDO GUZMAN SALAZAR, JESUS ALFREDO GUZMAN SALAZAR, a/k/a "Alfredo," OSCAR NOE MEDINA GONZALEZ, a/k/a "Panu," NESTOR ISIDRO PEREZ SALAS, a/k/a "Nini," and JORGE HUMBERTO FIGUEROA BENITEZ, a/k/a "27," the defendants, and others known and unknown, at least one of whom has been first brought to and arrested in the Southern District of New York, engaged in a continuing criminal enterprise (the "Continuing Criminal Enterprise"), in that IVAN ARCHIVALDO GUZMAN SALAZAR, JESUS ALFREDO GUZMAN SALAZAR, MEDINA GONZALEZ, PEREZ SALAS, and FIGUEROA BENITEZ knowingly and intentionally participated in a continuing series of violations of Title 21, United States Code, Chapter 13, Subchapters I and II, including, among others, Violations One through Five set forth below, undertaken by IVAN ARCHIVALDO GUZMAN SALAZAR, JESUS ALFREDO GUZMAN SALAZAR, MEDINA GONZALEZ, PEREZ SALAS, and FIGUEROA BENITEZ in concert with five and more persons with respect to whom IVAN ARCHIVALDO GUZMAN SALAZAR, JESUS ALFREDO GUZMAN SALAZAR, MEDINA GONZALEZ, PEREZ SALAS, and FIGUEROA BENITEZ were each one of several principal administrators, organizers, and leaders of the Continuing Criminal Enterprise, and where the violations involved at least 300 times the quantity of mixtures and substances containing a

detectable amount of fentanyl described in Title 21, United States Code, Section 841(b)(1)(B), and resulted in the Continuing Criminal Enterprise receiving $10 million and more in gross receipts during a 12-month period of its existence for the manufacture, importation, and distribution of fentanyl.

## Violation One

107.    From at least in or about 2014, up to and including on or about the date of the filing of this Indictment, in Mexico, the United States, and elsewhere, IVAN ARCHIVALDO GUZMAN SALAZAR, JESUS ALFREDO GUZMAN SALAZAR, a/k/a "Alfredo," OSCAR NOE MEDINA GONZALEZ, a/k/a "Panu," NESTOR ISIDRO PEREZ SALAS, a/k/a "Nini," and JORGE HUMBERTO FIGUEROA BENITEZ, a/k/a "27," the defendants, knowingly and intentionally combined, conspired, confederated, and agreed together and with each other to (i) import a controlled substance into the United States and into the customs territory of the United States from a place outside thereof, (ii) manufacture, distribute, and possess with intent to distribute a controlled substance, intending, knowing, and having reasonable cause to believe that such substance would be unlawfully imported into the United States and into waters within a distance of 12 miles of the coast of the United States, and (iii) manufacture, distribute, and possess with intent to distribute a controlled substance on board an aircraft registered in the United States, which controlled substance was 400 grams and more of mixtures and substances containing a detectable amount of fentanyl, in violation of Title 21, United States Code, Sections 952(a), 959(a), 959(c), 960(a)(1), 960(a)(3), 960(b)(1)(F), and 963.

## Violation Two

108.    From at least in or about 2014, up to and including on or about the date of the filing of this Indictment, in Mexico, the United States, and elsewhere, IVAN ARCHIVALDO

GUZMAN SALAZAR, JESUS ALFREDO GUZMAN SALAZAR, a/k/a "Alfredo," OSCAR NOE MEDINA GONZALEZ, a/k/a "Panu," NESTOR ISIDRO PEREZ SALAS, a/k/a "Nini," and JORGE HUMBERTO FIGUEROA BENITEZ, a/k/a "27," the defendants, knowingly and intentionally combined, conspired, confederated, and agreed together and with each other to distribute and possess with intent to distribute 400 grams and more of mixtures and substances containing a detectable amount of fentanyl, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 846.

Violation Three

109.   On or about September 10, 2019, in Mexico, the United States, and elsewhere, IVAN ARCHIVALDO GUZMAN SALAZAR, JESUS ALFREDO GUZMAN SALAZAR, a/k/a "Alfredo," and OSCAR NOE MEDINA GONZALEZ, a/k/a "Panu," the defendants, knowingly and intentionally manufactured, distributed, and possessed with intent to distribute a controlled substance, to wit, approximately 16 kilograms of mixtures and substances containing a detectable amount of fentanyl, intending, knowing, and having reasonable cause to believe that such substance would be unlawfully imported into the United States, in violation of Title 21, United States Code, Sections 959(a) and 960(b)(1)(F), and Title 18, United States Code, Section 2.

Violation Four

110.   On or about June 3, 2022, in Mexico, the United States, and elsewhere, IVAN ARCHIVALDO GUZMAN SALAZAR, JESUS ALFREDO GUZMAN SALAZAR, a/k/a "Alfredo," NESTOR ISIDRO PEREZ SALAS, a/k/a "Nini," and JORGE HUMBERTO FIGUEROA BENITEZ, a/k/a "27," the defendants, knowingly and intentionally distributed and possessed with intent to distribute a controlled substance, to wit, approximately 2.2 kilograms of

mixtures and substances containing a detectable amount of fentanyl, in violation of Title 21, United

States Code, Sections 841(a)(1) and 841(b)(1)(A), and Title 18, United States Code, Section 2.

<u>Violation Five</u>

111.   On or about July 7, 2022, in Mexico, the United States, and elsewhere,

IVAN ARCHIVALDO GUZMAN SALAZAR, JESUS ALFREDO GUZMAN SALAZAR, a/k/a

"Alfredo," NESTOR ISIDRO PEREZ SALAS, a/k/a "Nini," and JORGE HUMBERTO

FIGUEROA BENITEZ, a/k/a "27," the defendants, knowingly and intentionally distributed and

possessed with intent to distribute a controlled substance, to wit, approximately three kilograms of

mixtures and substances containing a detectable amount of fentanyl, in violation of Title 21, United

States Code, Sections 841(a)(1) and 841(b)(1)(A), and Title 18, United States Code, Section 2.

(Title 21, United States Code, Sections 848(a), 848(b), and 848(c);
and Title 18, United States Code, Sections 3238 and 2.)

**COUNT TWO**
**(Fentanyl Importation Conspiracy)**

The Grand Jury further charges:

112.   The allegations contained in paragraphs 1 through 104 of this Indictment

are incorporated as though fully set forth herein.

113.   From at least in or about 2014, up to and including on or about the date of

the filing of this Indictment, in the Southern District of New York, Mexico, and elsewhere, and in

an offense begun and committed out of the jurisdiction of any particular State or district, IVAN

ARCHIVALDO GUZMAN SALAZAR, JESUS ALFREDO GUZMAN SALAZAR, a/k/a

"Alfredo," OSCAR NOE MEDINA GONZALEZ, a/k/a "Panu," NESTOR ISIDRO PEREZ

SALAS, a/k/a "Nini," JORGE HUMBERTO FIGUEROA BENITEZ, a/k/a "27," LIBORIO

NUNEZ AGUIRRE, a/k/a "Karateca," NOEL PEREZ LOPEZ, a/k/a "Tio," SAMUEL LEON

ALVARADO, LUIS JAVIER BENITEZ ESPINOZA, a/k/a "El Fourteen," ALAN GABRIEL

NUNEZ HERRERA, JUAN PABLO LOZANO, a/k/a "Camaron," CARLOS LIMON, JESUS TIRADO ANDRADE, CARLOS OMAR FELIX GUTIERREZ, SILVANO FRANCISCO MARIANO, a/k/a "Rayo," JULIO MARIN GONZALEZ, MARIO ALBERTO JIMENEZ CASTRO, a/k/a "Kastor," SERGIO DUARTE FRIAS, ANA GABRIELA RUBIO ZEA, a/k/a "Gaby," KUN JIANG, YONGHAO WU, a/k/a "Tim," YAQIN WU, a/k/a "Lily," and HUATAO YAO, a/k/a "Yao," the defendants, and others known and unknown, at least one of whom has been first brought to and arrested in the Southern District of New York, knowingly and intentionally combined, conspired, confederated, and agreed together and with each other to violate the narcotics laws of the United States.

114.    It was a part and an object of the conspiracy that IVAN ARCHIVALDO GUZMAN SALAZAR, JESUS ALFREDO GUZMAN SALAZAR, a/k/a "Alfredo," OSCAR NOE MEDINA GONZALEZ, a/k/a "Panu," NESTOR ISIDRO PEREZ SALAS, a/k/a "Nini," JORGE HUMBERTO FIGUEROA BENITEZ, a/k/a "27," LIBORIO NUNEZ AGUIRRE, a/k/a "Karateca," NOEL PEREZ LOPEZ, a/k/a "Tio," SAMUEL LEON ALVARADO, LUIS JAVIER BENITEZ ESPINOZA, a/k/a "El Fourteen," ALAN GABRIEL NUNEZ HERRERA, JUAN PABLO LOZANO, a/k/a "Camaron," CARLOS LIMON, JESUS TIRADO ANDRADE, CARLOS OMAR FELIX GUTIERREZ, SILVANO FRANCISCO MARIANO, a/k/a "Rayo," JULIO MARIN GONZALEZ, MARIO ALBERTO JIMENEZ CASTRO, a/k/a "Kastor," SERGIO DUARTE FRIAS, ANA GABRIELA RUBIO ZEA, a/k/a "Gaby," KUN JIANG, YONGHAO WU, a/k/a "Tim," YAQIN WU, a/k/a "Lily," and HUATAO YAO, a/k/a "Yao," the defendants, and others known and unknown, would and did import into the United States and into the customs territory of the United States from a place outside thereof a controlled substance, in violation of Title 21, United States Code, Sections 952(a) and 960(a)(1).

115.   It was further a part and an object of the conspiracy that IVAN ARCHIVALDO GUZMAN SALAZAR, JESUS ALFREDO GUZMAN SALAZAR, a/k/a "Alfredo," OSCAR NOE MEDINA GONZALEZ, a/k/a "Panu," NESTOR ISIDRO PEREZ SALAS, a/k/a "Nini," JORGE HUMBERTO FIGUEROA BENITEZ, a/k/a "27," LIBORIO NUNEZ AGUIRRE, a/k/a "Karateca," NOEL PEREZ LOPEZ, a/k/a "Tio," SAMUEL LEON ALVARADO, LUIS JAVIER BENITEZ ESPINOZA, a/k/a "El Fourteen," ALAN GABRIEL NUNEZ HERRERA, JUAN PABLO LOZANO, a/k/a "Camaron," CARLOS LIMON, JESUS TIRADO ANDRADE, CARLOS OMAR FELIX GUTIERREZ, SILVANO FRANCISCO MARIANO, a/k/a "Rayo," JULIO MARIN GONZALEZ, MARIO ALBERTO JIMENEZ CASTRO, a/k/a "Kastor," SERGIO DUARTE FRIAS, ANA GABRIELA RUBIO ZEA, a/k/a "Gaby," KUN JIANG, YONGHAO WU, a/k/a "Tim," YAQIN WU, a/k/a "Lily," and HUATAO YAO, a/k/a "Yao," the defendants, and others known and unknown, would and did manufacture, distribute, and possess with intent to distribute a controlled substance, intending, knowing, and having reasonable cause to believe that such substance would be unlawfully imported into the United States and into waters within a distance of 12 miles of the coast of the United States, in violation of Title 21, United States Code, Sections 959(a) and 960(a)(3).

116.   It was further a part and an object of the conspiracy that IVAN ARCHIVALDO GUZMAN SALAZAR, JESUS ALFREDO GUZMAN SALAZAR, a/k/a "Alfredo," OSCAR NOE MEDINA GONZALEZ, a/k/a "Panu," NESTOR ISIDRO PEREZ SALAS, a/k/a "Nini," JORGE HUMBERTO FIGUEROA BENITEZ, a/k/a "27," LIBORIO NUNEZ AGUIRRE, a/k/a "Karateca," NOEL PEREZ LOPEZ, a/k/a "Tio," SAMUEL LEON ALVARADO, LUIS JAVIER BENITEZ ESPINOZA, a/k/a "El Fourteen," ALAN GABRIEL NUNEZ HERRERA, JUAN PABLO LOZANO, a/k/a "Camaron," CARLOS LIMON, JESUS

TIRADO ANDRADE, CARLOS OMAR FELIX GUTIERREZ, SILVANO FRANCISCO MARIANO, a/k/a "Rayo," JULIO MARIN GONZALEZ, MARIO ALBERTO JIMENEZ CASTRO, a/k/a "Kastor," SERGIO DUARTE FRIAS, ANA GABRIELA RUBIO ZEA, a/k/a "Gaby," KUN JIANG, YONGHAO WU, a/k/a "Tim," YAQIN WU, a/k/a "Lily," and HUATAO YAO, a/k/a "Yao," the defendants, and others known and unknown, would and did, on board an aircraft registered in the United States, manufacture, distribute, and possess with intent to distribute a controlled substance, in violation of Title 21, United States Code, Sections 959(c) and 960(a)(3).

117.     The controlled substance that IVAN ARCHIVALDO GUZMAN SALAZAR, JESUS ALFREDO GUZMAN SALAZAR, a/k/a "Alfredo," OSCAR NOE MEDINA GONZALEZ, a/k/a "Panu," NESTOR ISIDRO PEREZ SALAS, a/k/a "Nini," JORGE HUMBERTO FIGUEROA BENITEZ, a/k/a "27," LIBORIO NUNEZ AGUIRRE, a/k/a "Karateca," NOEL PEREZ LOPEZ, a/k/a "Tio," SAMUEL LEON ALVARADO, LUIS JAVIER BENITEZ ESPINOZA, a/k/a "El Fourteen," ALAN GABRIEL NUNEZ HERRERA, JUAN PABLO LOZANO, a/k/a "Camaron," CARLOS LIMON, JESUS TIRADO ANDRADE, CARLOS OMAR FELIX GUTIERREZ, SILVANO FRANCISCO MARIANO, a/k/a "Rayo," JULIO MARIN GONZALEZ, MARIO ALBERTO JIMENEZ CASTRO, a/k/a "Kastor," SERGIO DUARTE FRIAS, ANA GABRIELA RUBIO ZEA, a/k/a "Gaby," KUN JIANG, YONGHAO WU, a/k/a "Tim," YAQIN WU, a/k/a "Lily," and HUATAO YAO, a/k/a "Yao," the defendants, conspired to (i) import into the United States and into the customs territory of the United States from a place outside thereof, (ii) manufacture, distribute, and possess with intent to distribute, intending, knowing, and having reasonable cause to believe that such substance would be unlawfully imported into the United States and into waters within a distance of 12 miles of the coast of the United States, and (iii) manufacture, distribute, and possess with intent to distribute

on board an aircraft registered in the United States, was 400 grams and more of mixtures and substances containing a detectable amount of fentanyl, in violation of Title 21, United States Code, Section 960(b)(1)(F).

(Title 21, United States Code, Section 963; and Title 18, United States Code, Section 3238.)

## COUNT THREE
### (Fentanyl Trafficking Conspiracy)

The Grand Jury further charges:

118. The allegations contained in paragraphs 1 through 104 of this Indictment are incorporated as though fully set forth herein.

119. From at least in or about 2014, up to and including on or about the date of the filing of this Indictment, in the Southern District of New York, Mexico, and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular State or district, IVAN ARCHIVALDO GUZMAN SALAZAR, JESUS ALFREDO GUZMAN SALAZAR, a/k/a "Alfredo," OSCAR NOE MEDINA GONZALEZ, a/k/a "Panu," NESTOR ISIDRO PEREZ SALAS, a/k/a "Nini," JORGE HUMBERTO FIGUEROA BENITEZ, a/k/a "27," LIBORIO NUNEZ AGUIRRE, a/k/a "Karateca," NOEL PEREZ LOPEZ, a/k/a "Tio," SAMUEL LEON ALVARADO, LUIS JAVIER BENITEZ ESPINOZA, a/k/a "El Fourteen," ALAN GABRIEL NUNEZ HERRERA, JUAN PABLO LOZANO, a/k/a "Camaron," CARLOS LIMON, JESUS TIRADO ANDRADE, CARLOS OMAR FELIX GUTIERREZ, SILVANO FRANCISCO MARIANO, a/k/a "Rayo," JULIO MARIN GONZALEZ, MARIO ALBERTO JIMENEZ CASTRO, a/k/a "Kastor," SERGIO DUARTE FRIAS, ANA GABRIELA RUBIO ZEA, a/k/a "Gaby," KUN JIANG, YONGHAO WU, a/k/a "Tim," YAQIN WU, a/k/a "Lily," and HUATAO YAO, a/k/a "Yao," the defendants, and others known and unknown, at least one of whom has been first brought to and arrested in the Southern District of New York, intentionally and knowingly

combined, conspired, confederated, and agreed together and with each other to violate the narcotics laws of the United States.

120.    It was a part and an object of the conspiracy that IVAN ARCHIVALDO GUZMAN SALAZAR, JESUS ALFREDO GUZMAN SALAZAR, a/k/a "Alfredo," OSCAR NOE MEDINA GONZALEZ, a/k/a "Panu," NESTOR ISIDRO PEREZ SALAS, a/k/a "Nini," JORGE HUMBERTO FIGUEROA BENITEZ, a/k/a "27," LIBORIO NUNEZ AGUIRRE, a/k/a "Karateca," NOEL PEREZ LOPEZ, a/k/a "Tio," SAMUEL LEON ALVARADO, LUIS JAVIER BENITEZ ESPINOZA, a/k/a "El Fourteen," ALAN GABRIEL NUNEZ HERRERA, JUAN PABLO LOZANO, a/k/a "Camaron," CARLOS LIMON, JESUS TIRADO ANDRADE, CARLOS OMAR FELIX GUTIERREZ, SILVANO FRANCISCO MARIANO, a/k/a "Rayo," JULIO MARIN GONZALEZ, MARIO ALBERTO JIMENEZ CASTRO, a/k/a "Kastor," SERGIO DUARTE FRIAS, ANA GABRIELA RUBIO ZEA, a/k/a "Gaby," KUN JIANG, YONGHAO WU, a/k/a "Tim," YAQIN WU, a/k/a "Lily," and HUATAO YAO, a/k/a "Yao," the defendants, and others known and unknown, would and did distribute and possess with intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

121.    The controlled substance that IVAN ARCHIVALDO GUZMAN SALAZAR, JESUS ALFREDO GUZMAN SALAZAR, a/k/a "Alfredo," OSCAR NOE MEDINA GONZALEZ, a/k/a "Panu," NESTOR ISIDRO PEREZ SALAS, a/k/a "Nini," JORGE HUMBERTO FIGUEROA BENITEZ, a/k/a "27," LIBORIO NUNEZ AGUIRRE, a/k/a "Karateca," NOEL PEREZ LOPEZ, a/k/a "Tio," SAMUEL LEON ALVARADO, LUIS JAVIER BENITEZ ESPINOZA, a/k/a "El Fourteen," ALAN GABRIEL NUNEZ HERRERA, JUAN PABLO LOZANO, a/k/a "Camaron," CARLOS LIMON, JESUS TIRADO ANDRADE, CARLOS OMAR FELIX GUTIERREZ, SILVANO FRANCISCO MARIANO, a/k/a "Rayo,"

JULIO MARIN GONZALEZ, MARIO ALBERTO JIMENEZ CASTRO, a/k/a "Kastor," SERGIO DUARTE FRIAS, ANA GABRIELA RUBIO ZEA, a/k/a "Gaby," KUN JIANG, YONGHAO WU, a/k/a "Tim," YAQIN WU, a/k/a "Lily," and HUATAO YAO, a/k/a "Yao," the defendants, conspired to distribute and possess with intent to distribute was 400 grams and more of mixtures and substances containing a detectable amount of fentanyl, in violation of Title 21, United States Code, Section 841(b)(1)(A).

(Title 21, United States Code, Section 846; and Title 18, United States Code, Section 3238.)

## COUNT FOUR
### (Possession of Machineguns and Destructive Devices)

The Grand Jury further charges:

122.    The allegations contained in paragraphs 1 through 104 of this Indictment are incorporated as though fully set forth herein.

123.    From at least in or about 2014, up to and including on or about the date of the filing of this Indictment, in the Southern District of New York, Mexico, and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular State or district, and for which at least one of two or more joint offenders has been first brought to and arrested in the Southern District of New York, IVAN ARCHIVALDO GUZMAN SALAZAR, JESUS ALFREDO GUZMAN SALAZAR, a/k/a "Alfredo," OSCAR NOE MEDINA GONZALEZ, a/k/a "Panu," NESTOR ISIDRO PEREZ SALAS, a/k/a "Nini," JORGE HUMBERTO FIGUEROA BENITEZ, a/k/a "27," LIBORIO NUNEZ AGUIRRE, a/k/a "Karateca," NOEL PEREZ LOPEZ, a/k/a "Tio," SAMUEL LEON ALVARADO, LUIS JAVIER BENITEZ ESPINOZA, a/k/a "El Fourteen," JUAN PABLO LOZANO, a/k/a "Camaron," CARLOS LIMON, JESUS TIRADO ANDRADE, CARLOS OMAR FELIX GUTIERREZ, SILVANO FRANCISCO MARIANO, a/k/a "Rayo," JULIO MARIN GONZALEZ, MARIO ALBERTO JIMENEZ CASTRO, a/k/a

"Kastor," and SERGIO DUARTE FRIAS, the defendants, during and in relation to a drug trafficking crime for which they may be prosecuted in a court of the United States, to wit, the offenses charged in Counts One, Two, and Three of this Indictment, knowingly used and carried firearms, and, in furtherance of such crimes, knowingly possessed firearms, and aided and abetted the use, carrying, and possession of firearms, including machineguns that were capable of automatically shooting more than one shot, without manual reloading, by a single function of the trigger, as well as destructive devices.

(Title 18, United States Code, Sections 924(c)(1)(A), 924(c)(1)(B)(ii), 3238, and 2.)

## COUNT FIVE
### (Conspiracy to Possess Machineguns and Destructive Devices)

The Grand Jury further charges:

124.    The allegations contained in paragraphs 1 through 104 of this Indictment are incorporated as though fully set forth herein.

125.    From at least in or about 2014, up to and including on or about the date of the filing of this Indictment, in the Southern District of New York, Mexico, and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular State or district, IVAN ARCHIVALDO GUZMAN SALAZAR, JESUS ALFREDO GUZMAN SALAZAR, a/k/a "Alfredo," OSCAR NOE MEDINA GONZALEZ, a/k/a "Panu," NESTOR ISIDRO PEREZ SALAS, a/k/a "Nini," JORGE HUMBERTO FIGUEROA BENITEZ, a/k/a "27," LIBORIO NUNEZ AGUIRRE, a/k/a "Karateca," NOEL PEREZ LOPEZ, a/k/a "Tio," SAMUEL LEON ALVARADO, LUIS JAVIER BENITEZ ESPINOZA, a/k/a "El Fourteen," JUAN PABLO LOZANO, a/k/a "Camaron," CARLOS LIMON, JESUS TIRADO ANDRADE, CARLOS OMAR FELIX GUTIERREZ, SILVANO FRANCISCO MARIANO, a/k/a "Rayo," JULIO MARIN GONZALEZ, MARIO ALBERTO JIMENEZ CASTRO, a/k/a "Kastor," and SERGIO DUARTE

FRIAS, the defendants, and others known and unknown, at least one of whom has been first brought to and arrested in the Southern District of New York, knowingly and intentionally combined, conspired, confederated, and agreed together and with each other to violate Title 18, United States Code, Section 924(c).

126.   It was a part and an object of the conspiracy that IVAN ARCHIVALDO GUZMAN SALAZAR, JESUS ALFREDO GUZMAN SALAZAR, a/k/a "Alfredo," OSCAR NOE MEDINA GONZALEZ, a/k/a "Panu," NESTOR ISIDRO PEREZ SALAS, a/k/a "Nini," JORGE HUMBERTO FIGUEROA BENITEZ, a/k/a "27," LIBORIO NUNEZ AGUIRRE, a/k/a "Karateca," NOEL PEREZ LOPEZ, a/k/a "Tio," SAMUEL LEON ALVARADO, LUIS JAVIER BENITEZ ESPINOZA, a/k/a "El Fourteen," JUAN PABLO LOZANO, a/k/a "Camaron," CARLOS LIMON, JESUS TIRADO ANDRADE, CARLOS OMAR FELIX GUTIERREZ, SILVANO FRANCISCO MARIANO, a/k/a "Rayo," JULIO MARIN GONZALEZ, MARIO ALBERTO JIMENEZ CASTRO, a/k/a "Kastor," and SERGIO DUARTE FRIAS, the defendants, and others known and unknown, would and did, during and in relation to a drug trafficking crime for which they may be prosecuted in a court of the United States, to wit, the offenses charged in Counts One, Two, and Three of this Indictment, knowingly use and carry firearms, and, in furtherance of such crimes, knowingly possess firearms, including machineguns that were capable of automatically shooting more than one shot, without manual reloading, by a single function of the trigger, as well as destructive devices, in violation of Title 18, United States Code, Sections 924(c)(1)(A) and 924(c)(1)(B)(ii).

(Title 18, United States Code, Sections 924(o) and 3238.)

**COUNT SIX**
**(Money Laundering Conspiracy)**

The Grand Jury further charges:

127.   The allegations contained in paragraphs 1 through 104 of this Indictment are incorporated as though fully set forth herein.

128.   From at least in or about 2014, up to and including on or about the date of the filing of this Indictment, in the Southern District of New York, Mexico, and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular State or district, IVAN ARCHIVALDO GUZMAN SALAZAR, JESUS ALFREDO GUZMAN SALAZAR, a/k/a "Alfredo," OSCAR NOE MEDINA GONZALEZ, a/k/a "Panu," NESTOR ISIDRO PEREZ SALAS, a/k/a "Nini, JORGE HUMBERTO FIGUEROA BENITEZ, a/k/a "27," LIBORIO NUNEZ AGUIRRE, a/k/a "Karateca," NOEL PEREZ LOPEZ, a/k/a "Tio," SAMUEL LEON ALVARADO, LUIS JAVIER BENITEZ ESPINOZA, a/k/a "El Fourteen," ALAN GABRIEL NUNEZ HERRERA, JUAN PABLO LOZANO, a/k/a "Camaron," CARLOS LIMON, JESUS TIRADO ANDRADE, CARLOS OMAR FELIX GUTIERREZ, SILVANO FRANCISCO MARIANO, a/k/a "Rayo," JULIO MARIN GONZALEZ, MARIO ALBERTO JIMENEZ CASTRO, a/k/a "Kastor," SERGIO DUARTE FRIAS, ANA GABRIELA RUBIO ZEA, a/k/a "Gaby," KUN JIANG, YONGHAO WU, a/k/a "Tim," YAQIN WU, a/k/a "Lily," and HUATAO YAO, a/k/a "Yao," the defendants, and others known and unknown, at least one of whom has been first brought to and arrested in the Southern District of New York, knowingly and intentionally combined, conspired, confederated, and agreed together and with each other to commit money laundering offenses in violation of Title 18, United States Code, Section 1956.

129.   It was a part and an object of the conspiracy that IVAN ARCHIVALDO GUZMAN SALAZAR, JESUS ALFREDO GUZMAN SALAZAR, a/k/a "Alfredo," OSCAR

NOE MEDINA GONZALEZ, a/k/a "Panu," NESTOR ISIDRO PEREZ SALAS, a/k/a "Nini,"

JORGE HUMBERTO FIGUEROA BENITEZ, a/k/a "27," LIBORIO NUNEZ AGUIRRE, a/k/a

"Karateca," NOEL PEREZ LOPEZ, a/k/a "Tio," SAMUEL LEON ALVARADO, LUIS JAVIER

BENITEZ ESPINOZA, a/k/a "El Fourteen," ALAN GABRIEL NUNEZ HERRERA, JUAN

PABLO LOZANO, a/k/a "Camaron," CARLOS LIMON, JESUS TIRADO ANDRADE,

CARLOS OMAR FELIX GUTIERREZ, SILVANO FRANCISCO MARIANO, a/k/a "Rayo,"

JULIO MARIN GONZALEZ, MARIO ALBERTO JIMENEZ CASTRO, a/k/a "Kastor,"

SERGIO DUARTE FRIAS, ANA GABRIELA RUBIO ZEA, a/k/a "Gaby," KUN JIANG,

YONGHAO WU, a/k/a "Tim," YAQIN WU, a/k/a "Lily," and HUATAO YAO, a/k/a "Yao," the

defendants, and others known and unknown, knowing that the property involved in certain

financial transactions represented the proceeds of some form of unlawful activity, would and did

conduct and attempt to conduct such financial transactions which in fact involved the proceeds of

specified unlawful activity, to wit, (a) felonious narcotics offenses, in violation of Title 21, United

States Code, (b) offenses against a foreign nation involving the manufacture, importation, sale,

and distribution of a controlled substance (as such term is defined for the purposes of the

Controlled Substances Act), and (c) any act or acts constituting a continuing criminal enterprise,

as that term is defined in Title 21, United States Code, Section 848, with the intent to promote the

carrying on of said specified unlawful activity, in violation of Title 18, United States Code, Section

1956(a)(1)(A)(i).

       130.   It was further a part and an object of the conspiracy that IVAN

ARCHIVALDO GUZMAN SALAZAR, JESUS ALFREDO GUZMAN SALAZAR, a/k/a

"Alfredo," OSCAR NOE MEDINA GONZALEZ, a/k/a "Panu," NESTOR ISIDRO PEREZ

SALAS, a/k/a "Nini," JORGE HUMBERTO FIGUEROA BENITEZ, a/k/a "27," LIBORIO

NUNEZ AGUIRRE, a/k/a "Karateca," NOEL PEREZ LOPEZ, a/k/a "Tio," SAMUEL LEON ALVARADO, LUIS JAVIER BENITEZ ESPINOZA, a/k/a "El Fourteen," ALAN GABRIEL NUNEZ HERRERA, JUAN PABLO LOZANO, a/k/a "Camaron," CARLOS LIMON, JESUS TIRADO ANDRADE, CARLOS OMAR FELIX GUTIERREZ, SILVANO FRANCISCO MARIANO, a/k/a "Rayo," JULIO MARIN GONZALEZ, MARIO ALBERTO JIMENEZ CASTRO, a/k/a "Kastor," SERGIO DUARTE FRIAS, ANA GABRIELA RUBIO ZEA, a/k/a "Gaby," KUN JIANG, YONGHAO WU, a/k/a "Tim," YAQIN WU, a/k/a "Lily," and HUATAO YAO, a/k/a "Yao," the defendants, and others known and unknown, knowing that the property involved in certain financial transactions represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such financial transactions which in fact involved the proceeds of specified unlawful activity, to wit, (a) felonious narcotics offenses, in violation of Title 21, United States Code, (b) offenses against a foreign nation involving the manufacture, importation, sale, and distribution of a controlled substance (as such term is defined for the purposes of the Controlled Substances Act), and (c) any act or acts constituting a continuing criminal enterprise, as that term is defined in Title 21, United States Code, Section 848, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

131.   It was further a part and an object of the conspiracy that IVAN ARCHIVALDO GUZMAN SALAZAR, JESUS ALFREDO GUZMAN SALAZAR, a/k/a "Alfredo," OSCAR NOE MEDINA GONZALEZ, a/k/a "Panu," NESTOR ISIDRO PEREZ SALAS, a/k/a "Nini," JORGE HUMBERTO FIGUEROA BENITEZ, a/k/a "27," LIBORIO NUNEZ AGUIRRE, a/k/a "Karateca," NOEL PEREZ LOPEZ, a/k/a "Tio," SAMUEL LEON

ALVARADO, LUIS JAVIER BENITEZ ESPINOZA, a/k/a "El Fourteen," ALAN GABRIEL NUNEZ HERRERA, JUAN PABLO LOZANO, a/k/a "Camaron," CARLOS LIMON, JESUS TIRADO ANDRADE, CARLOS OMAR FELIX GUTIERREZ, SILVANO FRANCISCO MARIANO, a/k/a "Rayo," JULIO MARIN GONZALEZ, MARIO ALBERTO JIMENEZ CASTRO, a/k/a "Kastor," SERGIO DUARTE FRIAS, ANA GABRIELA RUBIO ZEA, a/k/a "Gaby," KUN JIANG, YONGHAO WU, a/k/a "Tim," YAQIN WU, a/k/a "Lily," and HUATAO YAO, a/k/a "Yao," the defendants, and others known and unknown, would and did transport, transmit, and transfer, and attempt to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside the United States and to a place in the United States from and through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit, (a) felonious narcotics offenses, in violation of Title 21, United States Code, (b) offenses against a foreign nation involving the manufacture, importation, sale, or distribution of a controlled substance (as such term is defined for the purposes of the Controlled Substances Act), and (c) any act or acts constituting a continuing criminal enterprise, as that term is defined in Title 21, United States Code, Section 848, in violation of Title 18, United States Code, Section 1956(a)(2)(A).

132. It was further a part and an object of the conspiracy that IVAN ARCHIVALDO GUZMAN SALAZAR, JESUS ALFREDO GUZMAN SALAZAR, a/k/a "Alfredo," OSCAR NOE MEDINA GONZALEZ, a/k/a "Panu," NESTOR ISIDRO PEREZ SALAS, a/k/a "Nini," JORGE HUMBERTO FIGUEROA BENITEZ, a/k/a "27," LIBORIO NUNEZ AGUIRRE, a/k/a "Karateca," NOEL PEREZ LOPEZ, a/k/a "Tio," SAMUEL LEON ALVARADO, LUIS JAVIER BENITEZ ESPINOZA, a/k/a "El Fourteen," ALAN GABRIEL NUNEZ HERRERA, JUAN PABLO LOZANO, a/k/a "Camaron," CARLOS LIMON, JESUS

TIRADO ANDRADE, CARLOS OMAR FELIX GUTIERREZ, SILVANO FRANCISCO MARIANO, a/k/a "Rayo," JULIO MARIN GONZALEZ, MARIO ALBERTO JIMENEZ CASTRO, a/k/a "Kastor," SERGIO DUARTE FRIAS, ANA GABRIELA RUBIO ZEA, a/k/a "Gaby," KUN JIANG, YONGHAO WU, a/k/a "Tim," YAQIN WU, a/k/a "Lily," and HUATAO YAO, a/k/a "Yao," the defendants, and others known and unknown, would and did transport, transmit, and transfer, and attempt to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside the United States and to a place in the United States from and through a place outside the United States, knowing that the monetary instrument and funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, and transfer was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, to wit, (a) felonious narcotics offenses, in violation of Title 21, United States Code, (b) offenses against a foreign nation involving the manufacture, importation, sale, or distribution of a controlled substance (as such term is defined for the purposes of the Controlled Substances Act), and (c) any act or acts constituting a continuing criminal enterprise, as that term is defined in Title 21, United States Code, Section 848, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i).

(Title 18, United States Code, Sections 1956(h), 1956(f), and 3238.)

## FORFEITURE ALLEGATIONS

133.    As a result of committing the controlled substance offense charged in Count One of this Indictment, IVAN ARCHIVALDO GUZMAN SALAZAR, JESUS ALFREDO GUZMAN SALAZAR, a/k/a "Alfredo," OSCAR NOE MEDINA GONZALEZ, a/k/a "Panu," NESTOR ISIDRO PEREZ SALAS, a/k/a "Nini," and JORGE HUMBERTO FIGUEROA

BENITEZ, a/k/a "27," the defendants, shall forfeit to the United States, pursuant to Title 21, United States Code, Sections 853 and 970, any and all property constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of said offense, any and all property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, said offense, and any and all interest in, claims against, and property and contractual rights affording a source of control over the continuing criminal enterprise described in Count One of this Indictment, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of the offense.

134.    As a result of committing the controlled substance offenses charged in Counts Two and Three of this Indictment, IVAN ARCHIVALDO GUZMAN SALAZAR, JESUS ALFREDO GUZMAN SALAZAR, a/k/a "Alfredo," OSCAR NOE MEDINA GONZALEZ, a/k/a "Panu," NESTOR ISIDRO PEREZ SALAS, a/k/a "Nini," JORGE HUMBERTO FIGUEROA BENITEZ, a/k/a "27," LIBORIO NUNEZ AGUIRRE, a/k/a "Karateca," NOEL PEREZ LOPEZ, a/k/a "Tio," SAMUEL LEON ALVARADO, LUIS JAVIER BENITEZ ESPINOZA, a/k/a "El Fourteen," ALAN GABRIEL NUNEZ HERRERA, JUAN PABLO LOZANO, a/k/a "Camaron," CARLOS LIMON, JESUS TIRADO ANDRADE, CARLOS OMAR FELIX GUTIERREZ, SILVANO FRANCISCO MARIANO, a/k/a "Rayo," JULIO MARIN GONZALEZ, MARIO ALBERTO JIMENEZ CASTRO, a/k/a "Kastor," SERGIO DUARTE FRIAS, ANA GABRIELA RUBIO ZEA, a/k/a "Gaby," KUN JIANG, YONGHAO WU, a/k/a "Tim," YAQIN WU, a/k/a "Lily," and HUATAO YAO, a/k/a "Yao," the defendants, shall forfeit to the United States, pursuant to Title 21, United States Code, Sections 853 and 970, any and all property constituting, or derived from, any proceeds the defendants obtained, directly or indirectly, as a result of the offenses, and any and all property used, or intended to be used, in any manner or part, to commit,

and to facilitate the commission of, the offenses charged in Counts Two and Three of this Indictment.

135. As a result of committing the firearms offenses charged in Counts Four and Five of this Indictment, IVAN ARCHIVALDO GUZMAN SALAZAR, JESUS ALFREDO GUZMAN SALAZAR, a/k/a "Alfredo," OSCAR NOE MEDINA GONZALEZ, a/k/a "Panu," NESTOR ISIDRO PEREZ SALAS, a/k/a "Nini," JORGE HUMBERTO FIGUEROA BENITEZ, a/k/a "27," LIBORIO NUNEZ AGUIRRE, a/k/a "Karateca," NOEL PEREZ LOPEZ, a/k/a "Tio," SAMUEL LEON ALVARADO, LUIS JAVIER BENITEZ ESPINOZA, a/k/a "El Fourteen," JUAN PABLO LOZANO, a/k/a "Camaron," CARLOS LIMON, JESUS TIRADO ANDRADE, CARLOS OMAR FELIX GUTIERREZ, SILVANO FRANCISCO MARIANO, a/k/a "Rayo," JULIO MARIN GONZALEZ, MARIO ALBERTO JIMENEZ CASTRO, a/k/a "Kastor," and SERGIO DUARTE FRIAS, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 924(d), all firearms and ammunition involved in and used in the commission of the offenses charged in Counts Four and Five of this Indictment.

136. As a result of committing the money laundering offense charged in Count Six of this Indictment, IVAN ARCHIVALDO GUZMAN SALAZAR, JESUS ALFREDO GUZMAN SALAZAR, a/k/a "Alfredo," OSCAR NOE MEDINA GONZALEZ, a/k/a "Panu," NESTOR ISIDRO PEREZ SALAS, a/k/a "Nini," JORGE HUMBERTO FIGUEROA BENITEZ, a/k/a "27," LIBORIO NUNEZ AGUIRRE, a/k/a "Karateca," NOEL PEREZ LOPEZ, a/k/a "Tio," SAMUEL LEON ALVARADO, LUIS JAVIER BENITEZ ESPINOZA, a/k/a "El Fourteen," ALAN GABRIEL NUNEZ HERRERA, JUAN PABLO LOZANO, a/k/a "Camaron," CARLOS LIMON, JESUS TIRADO ANDRADE, CARLOS OMAR FELIX GUTIERREZ, SILVANO FRANCISCO MARIANO, a/k/a "Rayo," JULIO MARIN GONZALEZ, MARIO ALBERTO

63

JIMENEZ CASTRO, a/k/a "Kastor," SERGIO DUARTE FRIAS, ANA GABRIELA RUBIO ZEA, a/k/a "Gaby," KUN JIANG, YONGHAO WU, a/k/a "Tim," YAQIN WU, a/k/a "Lily," and HUATAO YAO, a/k/a "Yao," the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any and all property, real and personal, involved in said offense, and any property traceable to such property, including but not limited to a sum of money in United States currency representing the amount of property involved in said offense or traceable to such property.

<u>Substitute Assets Provision</u>

137.    If any of the above-described forfeitable property, as a result of any act or omission of IVAN ARCHIVALDO GUZMAN SALAZAR, JESUS ALFREDO GUZMAN SALAZAR, a/k/a "Alfredo," OSCAR NOE MEDINA GONZALEZ, a/k/a "Panu," NESTOR ISIDRO PEREZ SALAS, a/k/a "Nini," JORGE HUMBERTO FIGUEROA BENITEZ, a/k/a "27," LIBORIO NUNEZ AGUIRRE, a/k/a "Karateca," NOEL PEREZ LOPEZ, a/k/a "Tio," SAMUEL LEON ALVARADO, LUIS JAVIER BENITEZ ESPINOZA, a/k/a "El Fourteen," ALAN GABRIEL NUNEZ HERRERA, JUAN PABLO LOZANO, a/k/a "Camaron," CARLOS LIMON, JESUS TIRADO ANDRADE, CARLOS OMAR FELIX GUTIERREZ, SILVANO FRANCISCO MARIANO, a/k/a "Rayo," JULIO MARIN GONZALEZ, MARIO ALBERTO JIMENEZ CASTRO, a/k/a "Kastor," SERGIO DUARTE FRIAS, ANA GABRIELA RUBIO ZEA, a/k/a "Gaby," KUN JIANG, YONGHAO WU, a/k/a "Tim," YAQIN WU, a/k/a "Lily," and HUATAO YAO, a/k/a "Yao," the defendants:

a.    cannot be located upon the exercise of due diligence;

b.    has been transferred or sold to, or deposited with, a third person;

c.    has been placed beyond the jurisdiction of the Court;

    d.      has been substantially diminished in value; or

    e.      has been commingled with other property which cannot be

               subdivided without difficulty,

it is the intent of the United States, pursuant to Title 21, United States Code, Sections 853(p) and

970, and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property

of the defendants up to the value of the above forfeitable property.

(Title 21, United States Code, Sections 853 and 970;
Title 18, United States Code, Sections 924(d) and 982; and
Title 28, United States Code, Section 2461(c).)

_____
FOREPERSON

_____
DAMIAN WILLIAMS
United States Attorney

4/4/23 Sealed Indictment filed.
     Twenty-three arrest warrants issued.
4MK
             Barbara Moses
             U.S.M.J.